**Charles LAYTON, Salvatore Gerardi, Appellees,**

v.

**Howard BEYER, Anthony Turner, Appellants.**

No. 91–5021.

United States Court of Appeals, Third Circuit.

Argued Sept. 17, 1991.

Decided Jan. 10, 1992.

8. Cardozo, Benjamin, *The Nature of the Judicial Process* 92–94 (1921).

Jonathan M. Hyman (argued), Newark, N.J., for appellee, Salvatore Gerardi.

Robert J. Del Tufo, Atty. Gen. State of N.J., Mary C. Jacobson, Madeleine W. Mansier (argued), Deputy Attys. Gen. State of N.J., Trenton, N.J., for appellants.

Before BECKER, SCIRICA, Circuit Judges and VanARTSDALEN, District Judge.*

## OPINION OF THE COURT

VanARTSDALEN, District Judge.

The defendants, Howard Beyer and Anthony C. Turner, the Administrator (Superintendent) and Assistant Superintendent respectively, of the New Jersey State Prison at Trenton, New Jersey (Trenton State Prison), appeal from a judgment entered against them and in favor of the plaintiff-appellee, Salvatore Gerardi (Gerardi), a long-term inmate in the Trenton State Prison. Judgment was entered, after a bench trial, in the sum of $315 as compensatory damages for violation of 42 U.S.C. § 1983. The crux of Gerardi's claim is that the defendants, as the responsible state officials, acting in violation of state regulations, failed to provide Gerardi with a hearing within five working days from the date he was removed from the general prison population and placed in restrictive custody, designated under regulations of the New Jersey Department of Corrections as the Prehearing Management Control Unit (Prehearing M.C.U.).

## I. FACTUAL BACKGROUND

In October, 1985, the Internal Affairs Unit of the New Jersey Department of

---

* The Honorable Donald W. VanArtsdalen, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Corrections[1] commenced an investigation into suspected wide-spread drug trafficking within the prison. On March 10, 1987, while the investigation was still in progress, an inmate informed the Internal Affairs Unit that approximately twenty inmates, including Gerardi, were not only involved in drug trafficking, but had placed a $4,800 bounty on the life of one of the inmates who the drug traffickers believed had informed on them.[2] Internal Affairs personnel advised the prison administrators of this information. Based on that information, the defendants, Turner and Beyer, ordered that approximately twenty inmates, including Gerardi, immediately be removed from the general prison population and placed in Prehearing M.C.U. Thus, on March 10, 1987, Gerardi, without any prior notice or hearing, was placed in Prehearing M.C.U. along with the other suspected inmates.

On March 17, 1987, which was five working days after Gerardi's placement in Prehearing M.C.U., the prison administrators received a typed investigation report from the Internal Affairs Unit. This report did not specifically establish Gerardi's involvement in the $4,800 bounty conspiracy. Prison officials requested the Internal Affairs Unit to provide more information as to Gerardi's participation in the conspiracy. A second report was prepared, but because the prison officials continued to find the report inadequate to sufficiently implicate Gerardi, they requested a third report which was received on March 30, 1987.

On March 25, 1987, Gerardi was provided with a "criteria sheet" by the prison officials. The "criteria sheet" was prepared in accordance with regulations promulgated and published by the New Jersey Department of Corrections in the New Jersey Administrative Code. N.J.Admin.Code tit. 10A, § 5–2.4. A "criteria sheet" contains extensive information concerning an inmate's past prison and criminal conduct. The "criteria sheet" is required to be utilized by the Management Control Unit Review Committee in deciding whether an inmate is to be placed in the Management Control Unit (M.C.U.). The "criteria sheet" delivered to Gerardi advised him that a hearing to determine whether he should be placed in M.C.U. was scheduled for March 30, 1987. Although offered an opportunity to attend the hearing, he refused to attend, asserting that he thought the hearing would not be fair to him. The hearing was thereafter continued, but finally held on April 16, 1987. Gerardi did not attend that hearing.[3] The hearing committee recommended that he be placed in M.C.U. and that recommendation was put into effect.

## II. LEGAL CONTENTIONS

Gerardi's claim is founded upon the following contentions: (1) under the Department of Corrections regulations, an inmate who is placed in Prehearing M.C.U. is entitled to a hearing within five working days (N.J.Admin.Code tit. 10A, § 5–2.8(b))[4]; (2) the regulations provide no exception; (3) the entitlement to a hearing creates a liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution; (4) his confinement without a hearing within five working days violated his Fourteenth Amendment Due Process rights; and (5) 42 U.S.C. § 1983 provides him with a civil cause of action for damages for such violation. Defendants contend that the Depart-

---

1. The Internal Affairs Unit is the unit responsible for conducting investigations at the direction of the Commissioner of the New Jersey Department of Corrections. N.J.Admin.Code tit. 10A, § 3–1.3.

2. It is not entirely clear from the record whether the identity of the person believed to have informed on the conspirators was known to the conspirators, or whether the $4,800 bounty included identifying such informant as well as killing him.

3. Defendants contended at trial that Gerardi was notified and afforded an opportunity to attend. Gerardi denies that he was ever notified of the continued hearing. The district court made no finding of fact on this issue.

4. By amendment to the regulations, effective July 15, 1991, the permissible time frame within which there must be a hearing was extended to "within ten working days." At the time of Gerardi's placement, the "five working days" rule was in effect.

ment of Corrections regulations do not create a liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment, and even if a constitutionally protected liberty interest is implicated, Gerardi was afforded due process of law despite the failure to hold a hearing within five working days from his confinement in Prehearing M.C.U.

Gerardi does not contend that his initial placement in Prehearing M.C.U. violated any of his due process or other rights, nor does he contend that his later confinement in M.C.U., after the "hearing" on April 16, 1987 violated any due process rights. His claim is for the failure to hold a hearing within the time prescribed by the regulations, which he contends define the reasonable time within which a hearing must be held in order to comport with due process.

## III.   DISCUSSION

■ The first task is to determine whether Gerardi had a constitutionally cognizable liberty interest. Such an interest can arise either from the Due Process Clause itself, or from state laws or regulations which create an entitlement. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983).

Gerardi claims that the New Jersey regulatory scheme creates a liberty interest in remaining part of the general prison population. The Supreme Court in *Hewitt* held that Due Process requires a hearing "within a reasonable time" when an inmate is deprived of such a cognizable liberty interest. *Id.* at 476 n. 8, 103 S.Ct. at 874 n. 8. Gerardi claims that the restrictive conditions of confinement in Prehearing M.C.U. combined with the mandatory language of the regulations create this liberty interest.

### A.   *The Regulatory Framework*

The regulation providing for a hearing within five working days of assignment to Prehearing M.C.U. must be considered within the overall M.C.U. regulatory framework.

The Management Control Unit is utilized to segregate inmates from the general prison population primarily for purposes of maintaining internal prison security. The Department of Corrections regulations define "Management Control Unit (M.C.U.)" as "a close custody unit to which an inmate may be assigned if he or she poses a substantial threat to the safety of others; of damage to or destruction of property; or of interrupting the operation of a State correctional facility." N.J.Admin.Code tit. 10A, § 5–1.3. In the same subsection of the New Jersey Administrative Code, a "Close Custody Unit" is defined as "an area within a correctional facility designated for assigning inmates who are removed from the general population for disciplinary or administrative reasons."

The regulations provide for inmate placement in the Management Control Unit by the decision of the Management Control Unit Review Committee, to whom recommendations for placement are made by certain committees, such as the institutional classification committee, and certain designated officers and prison officials including the Superintendent. N.J.Admin.Code tit. 10A, § 5–2.1. The Management Control Unit Review Committee is composed of several designated prison officials. N.J.Admin.Code tit. 10A, § 5–2.2.

Assignment to M.C.U. is set forth in N.J.Admin.Code tit. 10A, § 5–2.5 as follows:

10A:5–2.5 Assignment to the Management Control Unit (M.C.U.)

(a) An inmate shall be assigned to the Management Control (M.C.U.) when the Management Control Unit Review Committee (M.C.U.R.C.), after considering the criteria in N.J.A.C. 10A:5–2.4,[5] con-

---

5.  The regulations define nine specific criteria that the Management Control Unit Review Committee "shall ... utilize[ ] in determining the appropriateness of assigning inmates to the Management Control Unit." The criteria include, inter alia, the prison history of the inmate, past criminal offense record, reports from professional staff, reports of criminal activity within the prison, attitude toward obeying rules and following orders, work record, adjustment to any treatment or rehabilitative programs, and ability to house with other inmates in a nondisruptive and nondestructive manner. N.J.Admin.Code tit. 10A, § 5–2.4. It is this regulation

cludes that the inmate poses a substantial threat:

1. To the safety of others;

2. Of damage to or destruction of property; or,

3. Of interrupting the operation of a State correctional facility.

(b) Procedures for Management Control Classification Committee (M.C.U.R.C.) hearings described in N.J.A.C. 10A:5–2.6 shall be followed and completed prior to placement in M.C.U.

(c) If there is a need for immediate placement in the M.C.U., such placement shall be made in accordance with N.J.A.C. 10A:5–2.8.

Thus, in normal circumstances, if an inmate is to be assigned to M.C.U., the following process is followed. Evidence is gathered while the inmate remains in the general prison population. The criteria sheet is prepared. A copy of the criteria sheet is provided to the inmate, at least 24 hours before he is to appear before the M.C.U.R.C. N.J.Admin.Code tit. 10A, § 5–2.6. He then is brought before the M.C.U.R.C., and a hearing is held pursuant to certain prescribed procedures. *Id.* If it is found that the inmate poses a substantial threat (1) to the safety of others; (2) of damage to or destruction of property; or (3) of interrupting the operation of a State correctional facility; he is then assigned to the M.C.U. If it is not found that one of those criteria is met, the inmate may not be placed in M.C.U., and he therefore remains in the general prison population. There is no provision for assigning the inmate to M.C.U. if the criteria are not met.

However, New Jersey has also provided for assignment to M.C.U. when conditions are not normal. Section 5–2.5, subsection (c) of the regulation quoted above, provides a reference to section 5–2.8, for situations when "there is a need for immediate placement in the M.C.U."

N.J.Admin.Code tit. 10A, § 5–2.8 is entitled "Use of Prehearing Management Control Unit prior to the Management Control Unit Review Committee (M.C.U.R.C.) meeting." Merely from the title of this regulation, it is apparent that it is intended to govern situations where there is a need for immediate placement of the inmate in M.C.U., and where for prison security reasons the inmate should not remain in the general population until the next scheduled meeting of the M.C.U.R.C.

This regulation provided, in pertinent part, at the relevant time:

10A:5–2.8 Use of Prehearing Management Control Unit prior to the Management Control Unit Review Committee (M.C.U.R.C.) meeting

(a) The inmate may be placed in Prehearing M.C.U. by order of the Superintendent or his or her designee when there is reasonable evidence that, if the inmate remains in general population, there is an immediate threat:

1. To the safety of others;

2. Of damage to or destruction of property; or,

3. Of interrupting the safe, secure and orderly operation of the correctional facility.

(b) The inmate shall be entitled to a hearing within five working days following his placement into Prehearing M.C.U.

(c) An inmate placed in Prehearing M.C.U. shall be given the written notice of the Management Control Unit Review Committee (M.C.U.R.C.) hearing as described in N.J.A.C. 10A:5–2.6 within 24 hours following placement in Prehearing M.C.U.[6]

Comparing subsection (a) of this regulation with subsection (a) of § 5–2.5, we find that the criteria for placement in Prehearing M.C.U. are similar to the criteria for placement in M.C.U.[7] If the *M.C.U.R.C.*

that generated the so-called "criteria sheet" that was provided to Gerardi on March 25, 1987.

following placement in Prehearing M.C.U. from five working days to ten working days.

**6.** Amended by R.1991 d.358, effective July 15, 1991. See: 23 N.J.R. 1260(a), 23 N.J.R. 2143(a). This amendment changed the amount of time within which an inmate is entitled to a hearing

**7.** There is a slight difference in phrasing with respect to the third criteria for assignment to M.C.U. With respect to M.C.U., it is defined as "interrupting the operation of a State correc-

concludes that the inmate poses a *substantial threat* to others, property, or institutional security (as defined by the three criteria), the inmate "shall be assigned" to the M.C.U. If, prior to the M.C.U.R.C. meeting, the *Superintendent* has *reasonable evidence* that the inmate poses an *immediate threat* to security as defined by the same three criteria, the inmate may be placed in Prehearing M.C.U. Within five working days after an inmate is placed in Prehearing M.C.U., a hearing is required to be held before the M.C.U.R.C. At that time, he is either assigned to M.C.U. pursuant to § 5–2.5, or he is returned to the general prison population.[8] There is no provision for keeping an inmate in Prehearing M.C.U. or in M.C.U. if the criteria are not met.[9]

Although Prehearing M.C.U. inmates are housed in the same quarters as M.C.U. inmates, the conditions of confinement for inmates held in Prehearing M.C.U. are substantially more restrictive than the conditions of confinement for inmates held in M.C.U.[10]

### B. *Constitutional Law*

At the time Gerardi was placed in Prehearing M.C.U., he was, under the regulations, entitled to a hearing within five working days following his placement. No hearing was made available to him until March 30, 1987, a period of fourteen working days (Saturdays and Sundays excluded) from his initial placement.[11] It is clear, therefore, that defendants' treatment of Gerardi violated New Jersey's regulations. Gerardi has a federal claim, however, only if the conduct violated the Constitution as well. For the delay in holding a hearing to rise to the level of a due process violation, the regulation must create a constitutionally protected liberty interest.

### 1. *Creation of a Liberty Interest*

The Supreme Court's examination of the Commonwealth of Pennsylvania's prison

tional facility." With respect to Prehearing M.C.U., it is defined as "interrupting the safe, secure and orderly operation of the correctional facility." Obviously, meeting the Prehearing M.C.U. version of this criterion implies meeting the M.C.U. version. (If an inmate interrupts, for example, the safe operation of *the* facility, he is clearly interrupting the operation of *a* facility.)

**8.** It is interesting to note that the M.C.U.R.C. "shall meet at least once a week, ..." N.J.Admin.Code tit. 10A, § 5–2.3. Given this requirement, the M.C.U.R.C. ordinarily would meet within five working days of an inmate's confinement to Prehearing M.C.U. After the M.C.U.R.C. hearing, the inmate should no longer be held pursuant to the section governing use of Prehearing M.C.U. It is apparent, then, that § 5–2.8 was intended only as a stop-gap measure, to provide for immediate placement in Prehearing M.C.U. when there is insufficient time for the normal procedures to take their course, without serious danger to security.

**9.** It is not permissible to return an inmate to Prehearing M.C.U. if the M.C.U.R.C. decides that the criteria for placement in M.C.U. are not met. Procedurally, the regulation allowing placement in Prehearing M.C.U., before the M.C.U.R.C. meeting, is no longer available. Substantively, if the M.C.U.R.C. concludes that the inmate does not meet the criteria, it is difficult to see how the Superintendent could find *reasonable evidence* that the inmate meets the criteria.

**10.** Several examples appear in the record. A Prehearing M.C.U. inmate is permitted a shower only every third day instead of every day and the time allowed for exercise and recreation is less than that allowed M.C.U. inmates. Unlike M.C.U. inmates, Prehearing M.C.U. inmates are permitted no contact visits, may not receive food packages from persons outside of the prison, receive no pay or work credits for cleaning their own cells, may not congregate outside their cells with other inmates and must eat their meals in their cells. It is clear that while both Prehearing M.C.U. and M.C.U. inmates have substantially greater restrictions on their movements and permitted activities than inmates who are placed in the general prison population, the Prehearing M.C.U. inmates are substantially more restricted than the M.C.U. inmates who are placed in M.C.U. after a proper hearing. However, neither Prehearing M.C.U. nor M.C.U. placements are considered or treated as disciplinary confinements.

**11.** The defendants explain the delay because of the extensive paper work required in preparing the "criteria sheets" not only for Gerardi, but for the total of approximately twenty inmates, including Gerardi, who were placed in Prehearing M.C.U. at approximately the same time. Although there is a regulation which provides for some extension of time for holding a hearing where there is implemented a total lock-up of the prison, and "an unusually large number of inmates is involved," there was no total lock-up and the regulation N.J.Admin.Code tit. 10A, § 5–2.9(b) is therefore unavailable as a crutch.

system in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) is instructive in determining whether Gerardi had a constitutionally cognizable liberty interest. In that case, the Supreme Court unanimously agreed with this court that the Pennsylvania statutory framework governing the administration of state prisons gave rise to a liberty interest in a prisoner's continuing to reside in the general prison population. *Id.* at 466, 103 S.Ct. at 868.[12]

*Hewitt* makes clear that the Fourteenth Amendment Due Process Clause does not by force of its own words create a liberty interest in a prison inmate "being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters." *Id.* at 466–67, 103 S.Ct. at 869. In *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), the Court stated: "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *See also Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1982); *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980).

A liberty interest may arise from the laws of the states, as well as from the Due Process Clause. *Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–40, 49 L.Ed.2d 451 (1976). State regulations having the force of law, as well as state statutes, may create a liberty interest. *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (regulations granted inmates a liberty interest in parole); *cf. Olim v. Wakinekona,* 461 U.S. 238, 248–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1982) (Hawaii prison regulations do not create a liberty interest preventing transfer to a prison on the mainland because they "place no substan-

tive limitations on official discretion."). The Supreme Court held that the statutory framework of Pennsylvania at issue in *Hewitt* did create a liberty interest. The statutory framework of New Jersey is quite similar to that of Pennsylvania so far as applicable to the facts of this case. Although *Hewitt* involved temporarily confining an inmate in administrative custody pending a hearing and determination of disciplinary charges, the critical factors considered by the Supreme Court highlight the similarities between the Pennsylvania and New Jersey statutory and regulatory frameworks. The portions of the Pennsylvania statutes deemed relevant by the Supreme Court are set forth in *Hewitt,* 459 U.S. at 470–71 n. 6, 103 S.Ct. at 871 n. 6, as follows:

6. Title 37 Pa.Code § 95.104(b)(1) (1978) provides:

"An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title."

Section 95.104(b)(3) of the same Title provides:

"An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as

**12.** The Court was not unanimous as to what process was due, but unanimous that there was

a state created liberty interest.

soon as the reason for the security concern has abated but in all cases within ten days."

Finally, a State Bureau of Correction Administrative Directive states that when the State Police have been summoned to an institution:

"Pending arrival of the State Police, the institutional representative shall:

"1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security. A hearing complying with [37 Pa.Code § 95.103 (1972)] will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible." Pa.Admin.Dir. BC–ADM 004, § IV(B) (1975).

The *Hewitt* Court makes clear that merely because Pennsylvania created a careful procedural structure to regulate the use of administrative segregation, the Commonwealth did not necessarily thereby create a protected liberty interest. In concluding, nevertheless, that Pennsylvania had created a protected liberty interest, the Court stated:

Nonetheless, in this case the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, see n. 6, *supra*, and that administrative segregation will not occur absent specified substantive predicates—viz., "the need for control," or "the threat of a serious disturbance." Petitioners argue, with considerable force, that these terms must be read in the light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

*Id.* at 471–72, 103 S.Ct. at 871.

■ Similar to the statutory language at issue in *Hewitt*, there are explicit substantive predicates that must be met before an inmate may be placed in M.C.U. or Prehearing M.C.U. under the New Jersey regulations. The inmate must present a threat to the safety of others, a threat to property, or a threat to the operation of a facility. Absent these substantive predicates, the administrative officials have no discretion to place an inmate in M.C.U. or Prehearing M.C.U. An inmate has an objectively reasonable expectation that if he does not meet any of these predicates, he cannot be assigned to M.C.U. or Prehearing M.C.U. Because of the mandatory language of the New Jersey regulations, they create a liberty interest.[13]

The precise nature of the liberty interest created and the precise regulation which created it must be analyzed. We find that the New Jersey regulations, particularly title 10A, section 5–2.5, and through it section 5–2.8, create a liberty interest in re-

13. The New Jersey statutes do not expressly require that an inmate be either returned to the general prison population or placed in M.C.U. unless a hearing is held within the prescribed five (presently ten) working days. However, there is no authority for an exception to the regulations which would allow continued confinement in Prehearing M.C.U. beyond the five working day period. Consequently, whether or not a hearing is held an inmate must, under the regulations, either be returned to the general prison population or, if the hearing committee properly so determines, be placed in M.C.U. Thus, the fact that the Pennsylvania statutes expressly provide for return of an inmate when a hearing is not provided within the relevant time period is not a distinguishing factor, because the New Jersey regulations implicitly so provide. *See Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1979) (The statute provided for transfer to a mental hospital *if* a designated physician found that certain criteria were met. Though it did not explicitly provide that an inmate would *not* be transferred *unless* those criteria were met, the statute and practice of the penal complex gave rise to an objective expectation that an inmate would not be transferred unless the criteria were met. This, in turn, gave rise to a liberty interest which entitled the inmate to procedural protections in the determination that these criteria have been met.)

maining a part of the general prison population, or more particularly, remaining free of the restrictive confinement of M.C.U. and of Prehearing M.C.U.

An inmate can form, based on section 5–2.5, a reasonable expectation that he will not be confined to M.C.U. unless the M.C.U.R.C., after hearing, finds that he meets the criteria for such placement. There is, however, an exception to the hearing requirement, as specified in section 5–2.8, which tells him that he will not be confined to Prehearing M.C.U. unless there is reasonable evidence that he meets the established criteria. Reading both regulations in tandem, the inmate has a reasonable expectation that if he never poses a threat to others, to property, or to the operation of a facility, he will remain free of the restrictive confinement of M.C.U. and Prehearing M.C.U.

▆ Defendants raise two challenges to the creation of this particular interest which must be briefly addressed. First, they argue that since Gerardi does not dispute that he belongs in M.C.U., the state clearly could not have violated any liberty interest in his remaining in the general prison population. Second, they argue that Gerardi cannot have an interest in remaining a part of the general prison population as he could have always been transferred to another prison.

The fact that Gerardi ultimately belonged in M.C.U. is irrelevant to the question of whether he received due process on his way there. A mass murderer may ultimately be sentenced to the electric chair, and may concede the fact that the state has the right to so sentence him. Nonetheless, it would still be a denial of his constitutional rights to carry out the sentence without all of the procedural protections due process provides. Merely because a state ultimately has the right to deprive someone of liberty, it does not have the right to deprive that person of that liberty without due process of law. Here, Gerardi concedes that the state ultimately did have the right

to deprive him of his liberty to be in the general prison population. He is arguing, however, that it deprived him of that liberty without a hearing within a reasonable time, in other words, without due process of law.[14]

Similarly irrelevant is the fact that the administrators could have transferred Gerardi to another prison, rather than return him to the general prison population. New Jersey argues that administrators have the power to transfer prisoners at will. But this proves too much. If an inmate is always subject to an arbitrary transfer, he is subject to that transfer when he is in the general prison population as well as when in M.C.U. or Prehearing M.C.U. The possibility of transfer is merely one of the many lawful restrictions that is imposed on the liberty of an individual who is a member of the general prison population. Gerardi had a state-created liberty interest in remaining part of the general prison population as opposed to being confined to M.C.U. or Prehearing M.C.U. He had an interest in not losing the limited liberties granted inmates who are in the general population, regardless of what restrictions on liberty (i.e. possibility of transfer) may otherwise be placed on the general prison population.

It could also be argued that Gerardi cannot have an interest in remaining a part of the general prison population, because he can be removed from the general population without any hearing at all, and be placed in Prehearing M.C.U., at least for a short period of time. This objection, however, does not go to the question of the interest created, but instead to the question of the process which is due. Not every deprivation of liberty requires a pre-revocation hearing. As the Supreme Court held in *Hewitt*, the liberty interest in remaining part of the general population requires a post-revocation hearing only, one that is conducted "within a reasonable time after confining" the prisoner to the restrictive confinement. *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871.

14. In this sense, Gerardi's claim is analogous to a denial of a prisoner's right to a Speedy Trial. He is not challenging the outcome of the hearing, nor even challenging his original confinement pending the hearing. He is only challenging the fact that the hearing occurred too late.

The regulations regarding assignment to M.C.U. and Prehearing M.C.U. create a liberty interest in remaining part of the general prison population, and not being placed in restrictive confinement. In order for an inmate to be deprived of that interest, there must be a determination that the criteria for such placement have been met.

### 2. *Thompson*

The recent Supreme Court decision in *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) has caused considerable disagreement between the parties. In *Thompson*, the Court restated the test that a statute must meet in order to create a protected liberty interest, and applied that test to find that Kentucky regulations governing prison inmate visitation rights did not create a liberty interest.

The Court held that past decisions required that, in order to create a liberty interest, a statute must establish substantive predicates to govern official decision-making. *Id.* 109 S.Ct. at 1909. Second, the regulation must contain "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Id.* at 1910.

The regulations at issue in *Thompson* easily met the first test. If certain substantive predicates were met, the visitor could be excluded. Similarly, the New Jersey M.C.U. and Prehearing M.C.U. regulations clearly have substantive predicates, and therefore meet this first requirement.

The *Thompson* regulations failed to meet the second test. While the substantive predicates existed, and there was mandatory language in the regulations, the mandatory language did not limit the administrator's decision to a decision based solely on the substantive predicates. The language clearly stated that the visitor may be excluded for one of the listed reasons "but not limited to" them. Visitors need not "fall within one of the described categories in order to be excluded. The overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions." *Id.* at 1911.

Reducing the language to its simplest logical form, the regulation must not only list substantive predicates such as "A, B, and C" to guide the administrator's decision. It must also eliminate any official discretion to use criteria outside of "A, B, and C" to make the decision to exclude the visitor. That is, it must state that "visitors will only be denied if A, B, or C" or that "a visitor will be granted entrance unless A, B, or C." Instead, the directives at issue in *Thompson* provided, in so many words, that "a visitor can be excluded, for A, B, or C, but not limited to A, B, or C." Given the fact that A, B, and C created a non-exclusive list, the official's discretion was not limited and no liberty interest was created.

The M.C.U. and Prehearing M.C.U. regulations at issue, however, meet this second test of *Thompson*. An inmate can be assigned to M.C.U. or Prehearing M.C.U. only if the substantive predicates are met. There is no provision allowing an inmate to be sent to M.C.U. or Prehearing M.C.U. unless one or more of the substantive predicates are met. The regulatory definition of M.C.U. states that it is a place where an inmate may be assigned if one or more of the substantive predicates are met. N.J.Admin.Code tit. 10A, § 5–1.3. Thus the three substantive predicates are an exhaustive list which circumscribes and limits official discretion. Without one or more of the substantive predicates, an official is mandated to refrain from assigning the inmate to M.C.U. or Prehearing M.C.U.

Defendants argue that *Thompson* adds an additional requirement before state law creates a protected liberty interest; namely, that the official action must be mandated *whenever* the relevant substantive criteria have been met. *Id.* at 1909. That is, defendants argue that in order for the regulation in *Thompson* to create a liberty interest, it would have required wording such that "if A, B, or C is found, the visitor *must* be excluded." Some language in

*Thompson* can arguably be read to suggest that to create a liberty interest the statute must not only provide for substantive predicates which must be met in order for the deprivation to occur, but that once they are met, the outcome must then be mandated so as to eliminate *all* official discretion. *Id.*

We believe, however, that *Thompson*'s requirement that the statutory scheme must "mandat[e] the outcome to be reached upon a finding that the relevant criteria have been met" means that the statutes must force the decisionmaker to use the listed criteria as the only reasons for depriving the prisoner of the liberty interest in question. "The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining wh[e]ther an inmate may be deprived of the particular interest in question." *Id.* at 1910 n. 4.[15]

This reading of the requirement is supported by other statements in the *Thompson* opinion itself. The Court relied on the fact that the *Hewitt* regulations "mandated that certain procedures be followed, and 'that administrative segregation will not occur absent specified substantive predicates.'" It also cited *Board of Pardons v. Allen*, 482 U.S. 369, 377–78, 107 S.Ct. 2415, 2420–21, 96 L.Ed.2d 303 (1987) wherein a statute which used mandatory language to create a presumption that parole would be granted when certain findings were made created a liberty interest. *Id.* 109 S.Ct. at 1910. Clearly, the relevant "mandatory language" need not rob the administrator of discretion to forego the deprivation of the prisoner's liberty any time certain criteria are met. Instead, the language must force the administrator to refrain from imposing the restriction on the inmate in the absence of specified criteria being met.

The *Thompson* "regulations are not worded in such a way that an inmate could reasonably expect to enforce them against the prison officials." *Id.* at 1911.[16] If a New Jersey prison official attempted to put an inmate in M.C.U. or Prehearing M.C.U. for a reason other than an enumerated one (for example, as revenge for filing a § 1983 action), the inmate could reasonably expect to enforce the regulations against the official. These regulations do not allow the official to put the inmate in M.C.U. or Prehearing M.C.U. for that reason. The New Jersey regulations provide an inmate with a reasonable expectation that he or she will remain free of the restrictions of M.C.U. and Prehearing M.C.U. unless one of the three stated criteria is met. As such, they create a protected liberty interest similar to that created in *Hewitt.*

### 3. *The Process Due*

Having concluded that New Jersey Department of Corrections Regulations created a liberty interest, we must next inquire "what process is due?". *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The determination of the process due an inmate who asserts a claim based on a state-created liberty interest is governed by federal constitutional law. As the Supreme Court stated in *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980), the "minimum requirements [of procedural due process] being a matter of federal law, . . . are not diminished by the fact that the State may have specified its own procedures that it may

---

**15.** The use of the word "may" in the above footnote is significant. In order to create a liberty interest it is not necessary for the administrator to be forced to deprive the inmate of the interest whenever the substantive predicates are met. It is only necessary for the administrator to be forced *not* to deprive the inmate of the interest, unless the substantive predicates are met.

**16.** This emphasizes the point that the liberty interest is to be considered from the inmate's point of view; what *he* would expect to enforce against the prison officials. To the inmate, the question of whether the official is forced to assign him to restrictive custody (or to refuse entry to his visitor) when a substantive predicate is met is irrelevant. The mandatory element of a regulation which an inmate would expect to enforce is the element which forces the official to keep the inmate in the general population (or to admit the visitor).

deem adequate for determining the preconditions to adverse official action." *See also Arnett v. Kennedy*, 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) ("As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms.") (Powell, J. concurring in part).

▇ Gerardi's claim is based solely on the contention that the hearing that was afforded to him was not timely held. Although the New Jersey Department of Corrections regulations require a hearing for Prehearing M.C.U. detainees within five working days, this does not compel the conclusion that delay beyond the five working days violated federal constitutional due process. In *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871, the Court held that state prison authorities "were obligated to engage ... in an informal, non-adversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit,[17] *within a reasonable time after confining him* to administrative segregation." (emphasis added). The issue to be decided is whether Gerardi was afforded a hearing within a reasonable time after placement in Prehearing M.C.U. What is a "reasonable time" must be based on federal constitutional law, not state law.

▇ The determination of whether a hearing was afforded to Gerardi within a reasonable time cannot be established by any clear-cut or bright-line rule, or by any fixed or precise time period that would be generally applicable. The answer lies only by a careful review and consideration of the totality of the then existing circumstances. The inquiry should focus upon balancing the needs for and dangers to prison security against Gerardi's interests

in a prompt hearing. As required by *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), consideration should be given to the private interests at stake in the governmental decision, the governmental interests involved, and the value of the procedural requirements in determining what process is due. The governmental decision involved is the decision to not provide a hearing before March 30, 1987.[18]

The defendants contend that because approximately twenty inmates were placed in Prehearing M.C.U. along with Gerardi, it was impossible to complete the investigations and prepare all of the paper work, especially the detailed information contained on the "criteria sheet" required by N.J.Admin.Code tit. 10A, § 5–2.4, before the Management Control Unit Review Committee could perform its proper function in determining whether the inmates should be returned to the general prison population or placed in M.C.U. Although this may explain the reason for the fourteen working days' time lag, consideration should be given to the alternative of whether prison security would have been threatened if Gerardi and the others similarly situated had been returned to the general prison population while the investigations and paper work were being completed. Sections 2.1 through 2.7 of the N.J.Admin.Code tit. 10A, provide for hearing and placement in M.C.U. without requiring an inmate to be first placed in Prehearing M.C.U. Prehearing M.C.U. is provided to accommodate situations where there is an immediate threat to prison security.

The interest of the defendants in prison security was exceptionally strong. From a long and apparently extensive investigation by the Internal Affairs Unit, there was

---

**17.** There is evidence that Gerardi sent a written note to the Management Control Unit Review Committee stating that he would not attend the March 30, 1987 hearing because he did not think he would get a fair hearing. There is nothing in the record to establish whether the Committee considered this statement in any way. The district court made no finding of fact concerning the sending of the note, or any consideration given to it by the Committee.

**18.** Because Gerardi was afforded a hearing on March 30, 1987, which he refused, we think the fact that he was detained in Prehearing M.C.U. until April 16, 1987 when a hearing, unattended by Gerardi, was actually held is irrelevant to the issues of whether there was lack or denial of due process, and to any damages to which Gerardi may be entitled.

evidence of a widespread drug trafficking conspiracy within the prison composed of approximately twenty inmates, including Gerardi. More significantly, information had been received that the conspirators had placed a bounty of $4,800 upon the life of an inmate who had informed on the conspirators. With this information, until it could be fully investigated and determined whether the inmates held in Prehearing M.C.U. should be confined in M.C.U. or returned to the general prison population, some delay, perhaps substantial delay, before holding a hearing might well have been reasonable. Consideration should also be given to whether, despite the ongoing investigation, sufficient information was available for the Committee to perform its proper function within the time limit prescribed by the regulations.

On the other hand, if the delay was solely for the purpose of administrative convenience, or because of investigators's negligent mistakes or general lack of diligence, the delay could be found to be constitutionally unreasonable. A similar result might follow if the hearing was delayed purely in order to develop sufficient evidence against Gerardi so as to assure that the Committee would assign him to M.C.U.[19] This is particularly true if, in the opinion of prison authorities, Gerardi did not constitute a continuing threat to prison security during the investigation.

We cannot presently decide whether or not the delay from March 10, 1987 until March 30, 1987 was reasonable because the district court did not specifically address this issue. In denying the motion for summary judgment, the district court ruled that Gerardi had a protected liberty interest requiring a timely hearing after placement in Prehearing M.C.U. We agree. The district court further held that without an evidentiary hearing it could not rule "as a matter of law that an informal, nonadversarial review was provided for plaintiff within a reasonable time following his transfer to Prehearing M.C.U." Again, we agree. Unfortunately, however, after the bench trial, the district court seemed to rely on the mandatory "five working days" rule contained in the regulations as the sole guide for what is a reasonable time. The award of damages, although quite modest, was obviously based on the conclusion that all delay after the lapse of five working days constituted unreasonable delay.

The state regulations may be of some assistance and guidance in determining what is a reasonable time. The regulatory "five working days" rule may be found to reflect the considered judgment of the Department of Corrections as to how much time is reasonably required to prepare and process the "criteria sheet," provide notice to the inmate, and arrange for the hearing. The provision in the regulations that exception to the "five working days" rule may occur only in the event of a complete prison lockdown,[20] may suggest that the Department of Corrections concluded that no other situation would justify a delay beyond five working days. Although consideration of the state regulations may be relevant in determining what is a reasonable time, they clearly do not, in and of themselves,

---

**19.** It may seem unreasonable, at first glance, that prison authorities do not have to power to confine an individual inmate to Prehearing M.C.U. for however long it takes to gather sufficient evidence against him. However, two things must be remembered. First, this is a state created interest. If New Jersey had so chosen, it could have created a regulatory scheme whereby any inmate could be restrictively confined on a lesser showing than is required here. Instead, the New Jersey regulations gave each inmate a reasonable expectation that he or she would not be confined to M.C.U. or Prehearing M.C.U. absent the existence of certain substantive predicates. Second, the constitutional dimensions of the interest thereby created do not require a pre-revocation hearing.

That is, an inmate may be sent to Prehearing M.C.U. before a hearing is mandated. The constitution does not even mandate a hearing within a certain number of days after the inmate is confined to Prehearing M.C.U. The hearing must take place within a reasonable time. A long delay for the purposes of gathering evidence may or may not be reasonable. It may, for example, be reasonable if the investigators were diligently gathering evidence. However, if the delay was such that the inmate was confined to Prehearing M.C.U. maliciously, and solely in order to "get something on him," it would be unreasonable.

**20.** N.J.Admin.Code tit. 10A, § 5–2.9.

define or control the requirements of the Constitution. *Hewitt* was concerned primarily with the substance of the proceeding required where state law is found to have created a liberty interest, but the opinion noted the necessity of the proceeding occurring within a reasonable time and that administrative segregation may not be a pretext for indefinite confinement. *See Hewitt*, 459 U.S. at 476–77 nn. 8, 9, 103 S.Ct. at 874 nn. 8, 9. It is noteworthy that although the opportunity for a hearing was at least arguably beyond the time allowed under state law, the Court in *Hewitt*, without direct mention of timeliness, concluded that the inmate had received due process.

Because the district court did not make findings of fact or conclusions of law in reference to whether the delay from the time Gerardi was placed in Prehearing M.C.U. on March 10, 1987 to the time when he was afforded a hearing on March 30, 1987 was reasonable for purposes of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the case must be remanded to the district court. The district court should determine whether Gerardi was afforded a hearing within a reasonable time after his confinement to Prehearing M.C.U.

Although there are numerous cases that have considered the constitutional time limits within which an inmate may be held in restrictive nondisciplinary custody without a hearing or other satisfactory "evidentiary review" (*See Hewitt*, 459 U.S. at 476, 103 S.Ct. at 874), analysis of these cases provides little assistance in determining whether a particular confinement complies with due process. *E.g., Russell v. Coughlin*, 910 F.2d 75 (2d Cir.1990) (ten day confinement without explanation other than inadvertently failing to comply with a state mandated hearing within seven days was unreasonable); *Gittens v. LeFevre*, 891 F.2d 38 (2d Cir.1989) (denying inmate opportunity to make a statement challenging his restrictive custody until a disciplinary hearing seven days after confinement violated due process); *Perez v. Neubert*, 611

F.Supp. 830 (D.N.J.1985) (three week delay in holding hearing plus one week delay after hearing awaiting a decision during which inmate was held in Prehearing M.C.U. was not unreasonable). Each case must be decided on its facts, balancing the threat to prison security against the liberty interest of the inmate in having a prompt hearing.

As heretofore noted, no bright-line rule can be adopted as to what is a reasonable time within which the constitutionally required hearing or other constitutionally adequate "evidentiary review" must occur. Without attempting to establish any rigid guidelines other than there be consideration of all of the particular facts and circumstances, we suggest that some of the important factors are the following:

From the standpoint of prison security concerns,[21] the district court should consider the nature and extent of the drug trafficking threat that may have impaired prison security, the then available evidence of the assassination plot, and any threat of general prison violence and disruption posed by Gerardi in conjunction with the approximately twenty inmates who had been placed in Prehearing M.C.U. The district court should consider the need and complexity of any additional investigation that was required to provide the inmates, including Gerardi, a constitutionally fair hearing. Obviously the diligence and good faith of the prison officials in conducting the investigation, processing the necessary paper work and arranging for the hearings would be relevant. In making the analysis from the standpoint of the real or perceived institutional security threats, the court must give the deference that is to be accorded prison officials in determining how to run prisons and in determining issues of prison security and placement of inmates and on "the officials' general knowledge of prison conditions and tensions." *Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9.

The prison administrative and security interests and requirements are to be balanced against Gerardi's interests. The Su-

---

21. In this case, on the basis of information available to the prison authorities at the time, prison security concerns appear to have been exceptionally strong.

preme Court has ruled that prison inmate's interest in transfers "from one extremely restricted environment to an even more confined situation" is "not one of great consequence." *Id.* at 473, 103 S.Ct. at 872. Nevertheless, it is, as we have held in this case, an interest deserving due process protection. The extent of the additional restrictions placed on Prehearing M.C.U. inmates in contrast to general prison population inmates as well as M.C.U. inmates is another factor to be considered.[22] Also, if additional investigation was necessary before a hearing could be held, consideration should be given to whether, and to what extent if any, such investigation would have been hindered or delayed or prison security compromised if Gerardi and possibly other inmates similarly situated had been returned to general prison population pending a hearing.[23] The district court might also consider whether the more stringent Prehearing M.C.U. restrictions as opposed to the somewhat less stringent M.C.U. restrictions were necessary or even administratively beneficial to the prison officials in this case.[24] This may, to some extent, depend on whether both classifications of inmates were confined in the same housing unit, as the record suggests, but as to which the district court made no finding.

We recognize that we have not set out in detail all the factors that the district court may find relevant in determining the issue of whether there was a due process violation. Upon remand, the parties may seek to present further evidence. The district court may conduct such further proceedings, including reopening of the trial for presentation of additional evidence, that the district court deems necessary or appropriate.

The judgment of the district court will be vacated and the case remanded to the district court for such further proceedings as are consistent with this opinion.

The parties shall each bear their own costs.

---

22. The extent of the additional restrictions is relevant to the issue of how promptly a hearing or other constitutionally adequate evidentiary review must be held. If a due process violation is determined, the extent of such additional restrictions is also obviously relevant on the issue of the amount of damages.

23. For example, if the identity of the person on whom the $4,800 bounty had been placed was known to prison officials, the district court might consider the feasibility of such inmate being transferred to another institution or placed in protective custody.

24. The record does not disclose, and the parties have not advised us of, any regulations that require or provide for greater restrictions upon Prehearing M.C.U. inmates than are imposed on regular M.C.U. inmates, nor is there any evidence as to the reason for such disparity.