**Daulton BANKS, Plaintiff,**

v.

**William FAUVER, Patrick Arvonio, Regina Larkins and Timothy Dill, Defendants.**

**Civ. No. 92–2321 (HLS).**

United States District Court, D. New Jersey.

Sept. 11, 1992.

---

Daulton Banks, pro se.

Dianne Moratti, Deputy Atty. Gen., Trenton, N.J., for defendants.

OPINION

SAROKIN, District Judge.

Before the court is the motion of defendants William Fauver, Patrick Arvonio, and Timothy Dill to dismiss plaintiff's complaint for failure to state a claim upon which relief may be granted.

*Background*

Plaintiff Daulton Banks is a prison inmate currently incarcerated at Northern State Prison. Banks alleges that on April 2, 1992, following a visit by his wife, he was involuntarily placed into protective custody. On April 16, 1992, Banks appeared before Hearing Officer Regina Larkins for a hearing regarding his placement in protective custody. In support of his confinement, the prison authorities produced a report prepared by the Internal Affairs department ("Internal Affairs"), stating that the authorities had received an anonymous telephone call reporting that plaintiff's life was in danger and that evidence had been compiled of Banks' involvement in drug trafficking. Complaint at ¶ 11. Additionally, plaintiff was informed that he was being placed into protective custody based on a charge that his wife had attempted to smuggle money into the prison to him during her visit on April 2. Def. Mem. at 3.

Plaintiff allegedly introduced evidence that his wife had no knowledge of the money she brought into the prison and that the report produced by Internal Affairs was "clear fabrication."[1] Plaintiff further explained that "he [had] no problems with anyone and [that] his life was not in any danger and that he was not 'attempting' to facilitate the sum of $790 into the institution." Complaint at ¶ 10. Plaintiff sought release from protective custody.

On April 20, Banks received notification that his application for release from protective custody had been denied. The notice of the hearing adjudication recited, as the

---

1. Banks explained that the $790 had been concealed in the toe of a sneaker that his wife had collected from her mother's house and brought to the prison, and that his wife had not been aware of the presence of the money. Banks' wife's mother submitted a sworn statement, dated April 9, 1992, averring that she had placed the money in the sneaker for safe-keeping. Complaint, Ex. 1. On April 22, 1992, the Municipal Court of Woodbridge found Banks' wife not guilty of introducing the funds into the prison. Complaint, at ¶ 14 & Ex. 3.

"facts ... to support initial placement," that:

> [Inmate] was placed in [protective custody] following delivery of package by wife—intended for [Inmate] Banks—which on examination was found to contain $790 ... concealed in sneaker. [Inmate] also suspected of involvement in drug trafficking. (Ex. A–1—Internal Affairs Report).

Complaint Ex. 2. Under the heading, "Summary of facts on which decision is based," the report stated:

> [Inmate] was placed in [protective custody] 4–2–92 following discovery of $790 in sneaker in package delivered to [the prison] by [Inmate's] wife. Subsequent to confiscation, telephone call was received from unnamed female indicating [Inmate] Banks to be in danger as result of money confiscation and drugs. [Internal Affairs] investigation indicates [Inmate] Banks under suspicion re drug trafficking at [the prison]. [Inmate] denies involvement in drugs and ... [illegible] money incident as forgetfulness by mother. Considering sum of money involved and [Inmate] being suspected of drug involvement, the claim of "forgetfulness" not believed.

*Id.* On April 28, 1992, Banks appealed the decision of the hearing officer to the Prison Superintendent.

On June 2, 1992, Banks commenced this action, alleging that defendants' actions violated his federal due process rights. Specifically, Banks contends that defendants failed to follow the proper procedures in obtaining the information that formed the basis for his commitment, that the factors considered by them were insufficient as a matter of law, and that the procedures employed at the hearing failed to provide him due process. Banks seeks a declaratory judgment and punitive and compensatory damages. Defendants Fauver, Arvonio and Dill have now moved to dismiss this action against them for failure to state a claim.

*Discussion*

For the purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must take all facts alleged in the complaint as true, and must only dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Defendants contend that plaintiff's complaint should be dismissed because he has no liberty interest in remaining free of protective custody, because the complaint lacks specificity and because defendants Fauver, Arvonio, and Dill are shielded from liability by the qualified immunity doctrine. Defendants further contend that the damage claims against them should be dismissed because these claims are barred by the Eleventh Amendment.

*Due Process Claim*

The requirements of the Due Process Clause of the Fourteenth Amendment of the United States Constitution are not triggered unless a protected interest is at stake. *Meachum v. Fano,* 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976). Liberty interests "protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the states." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court held that the Due Process Clause itself does not create a liberty interest in a prison inmate "being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters," and that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of containment ordinarily contemplated by a prison sentence." 459 U.S. at 466–68, 103 S.Ct. at 869. Accordingly, the court concludes that the Due Process Clause does not directly create a liberty interest in a prisoner remaining unconfined in protective custody.

However, a state may also create a liberty interest protected by the Due Process clause through enactment of laws or regulations having the force of law. *Board of*

*Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Hewitt,* 459 U.S. at 469, 103 S.Ct. at 870. Thus, in *Hewitt,* the Court held that Pennsylvania, through statutes and regulations setting forth the procedures for confining an inmate to administrative segregation, had created a liberty interest in remaining in the general prison population. 459 U.S. at 472, 103 S.Ct. at 871. Similarly, in *Layton v. Beyer,* 953 F.2d 839 (3d Cir.1992), the Third Circuit held that the State of New Jersey, through regulations governing confinement in a Management Control Unit (MCU) of prisoners posing a threat to safety, property, or the operation of the prison had created a liberty interest in remaining in the general prison population, outside of the MCU.

*Hewitt* makes clear that mere regulatory or statutory creation of procedural structures governing prison practices does not necessarily create a protected liberty interest. Rather, the Court cited two factors as the basis for concluding that a liberty interest had been created:

> the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

459 U.S. at 472, 103 S.Ct. at 871. The regulation at issue in *Hewitt* stated that an inmate "may" be placed in administrative custody "not routinely but based upon [the prison administrator's] assessment of the situation and the need for control" or "where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others." *Id.* at 470, n. 6, 103 S.Ct. at 871, n. 6. The regulations further state that "[i]f no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days." *Id.* Accordingly,

the Court found that the Pennsylvania regulation both used language of a mandatory character and specified substantive predicates, thereby giving rise to a reasonable expectation that an inmate would not be placed in administrative segregation absent the circumstances identified in the regulations.

In *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989), the Supreme Court added a further requirement: in addition to establishing substantive predicates to govern official decision-making, the regulation must contain "specific directives to the decision-maker that if the regulations' substantive predicates are present, a particular outcome must follow." As the Third Circuit explained in *Layton,*

> the regulation must not only list substantive predicates such as "A, B, and C" to guide the administrator's decision. It must also eliminate any official discretion to use criteria outside of "A, B, and C" to make the decision to exclude the visitor.[2]

953 F.2d at 848. Thus, in *Thompson,* the Court held that no liberty interest had been created by a regulation governing prison visitation rights, since the regulation included the caveat that "administrative staff reserves the right to allow or disallow visits" and stated that it was merely the "policy" of the prison "to respect the rights of inmates to have visits." 490 U.S. at 464, 109 S.Ct. at 1911.

Applying these principles, the Third Circuit held in *Layton* that a New Jersey disciplinary confinement regulation, similar to the protective custody regulation at issue in the present case, created a liberty interest subject to due process protections. The regulations at issue in *Layton* defined the MCU as:

---

**2.** The Third Circuit rejected the argument that *Thompson* also requires for the establishment of a liberty interest that the state must have no discretion to refrain from depriving the individual's liberty once the substantive predicates are found to be met: "[c]learly, the relevant 'mandatory language' need not rob the administrator of discretion to forego the deprivation of the prisoner's liberty any time certain criteria are met. Instead, the language must force the administrator to refrain from imposing the restriction on the inmate in the absence of specified criteria being met." *Layton,* 953 F.2d at 849.

a close custody unit to which an inmate may be assigned if he or she poses a substantial threat to the safety of others; of damage to or destruction of property; or of interrupting the operation of a State correctional facility.

N.J.A.C. 10A:5–1.3. The regulations further provide that "[a]n inmate shall be assigned to the [MCU] when the [MCU] Review Committee, after considering" nine specific criteria,[3]

> concludes that the inmate poses a substantial threat: 1. To the safety of others; 2. Of damage to or destruction of property; or 3. Of interrupting the operation of a State correctional facility.

*Layton,* 953 F.2d at 842–43 (citing N.J.A.C. 10A:5–2.5). Before placement in the MCU, the inmate is entitled to a hearing and prior notice of the basis for determining his suitability for detention. N.J.A.C. 10A:5–2.5 & –2.6. Interpreting these regulations, the *Layton* court stated that, if it is not found that one of the three criteria has been met, "the inmate may not be placed in the MCU." 953 F.2d at 842.

The regulations considered in *Layton* also provide in emergent circumstances for confinement in the MCU prior to the MCU Review Committee hearing. The regulations state that:

> The inmate may be placed in Prehearing M.C.U. . . . when there is reasonable evidence that, if the inmate remains in general population, there is an immediate threat: 1. To the safety of others; 2. Of damage to or destruction of property; or, 3. Of interrupting the safe, secure and orderly operation of the correctional facility. . . . The inmate shall be entitled to a hearing within five working days fol-

lowing his placement into Prehearing M.C.U.

N.J.A.C. 10A:5–28.

Applying the *Hewitt* factors, the circuit court found that the requirement that the inmate "must present a threat to the safety of others, a threat to property, or a threat to the operation of the facility" before being placed in MCU or Prehearing MCU constituted "substantive predicates" limiting the discretion of the state. *Layton* also found that the regulations contained the type of mandatory language contemplated by *Hewitt.*[4] Finally, the *Layton* court held that the MCU regulations met the *Thompson* requirement that "if the regulations' substantive predicates are present, a particular outcome must follow." 490 U.S. at 463, 109 S.Ct. at 1910.

> An inmate can be assigned to M.C.U. or Prehearing M.C.U. only if the substantive predicates are met. There is no provision allowing an inmate to be sent to M.C.U. or Prehearing M.C.U. unless one or more of the substantive predicates are met. The regulatory definition of M.C.U. states that it is a place where an inmate may be assigned if one or more of the substantive predicates are met. [N.J.A.C. 10A:5–1.3.] Thus the three substantive predicates are an exhaustive list which circumscribes and limits official discretion. Without one or more of the substantive predicates, an official is mandated to refrain from assigning the inmate to M.C.U. or Prehearing M.C.U.

*Layton,* 953 F.2d at 848. Based on this analysis, the Third Circuit concluded:

> The New Jersey regulations provide an inmate with a reasonable expectation

---

**3.** The criteria include, "inter alia, the prison history of the inmate, past criminal offense record, reports from professional staff, reports of criminal activity within the prison, attitude toward obeying rules and following orders, work record, adjustment to any treatment or rehabilitative programs, and ability to house with other inmates in a nondisruptive and nondestructive manner." *Layton,* 953 F.2d at 842 n. 5 (citing N.J.A.C. 10A:5–2.4.

**4.** The Third Circuit found that, although no regulation expressly so states, the regulations "implicitly" provide that an inmate must be re-

leased from Prehearing MCU if a hearing is not held within the five day period, since "there is no authority for an exception to the regulations which would allow continued confinement in Prehearing M.C.U. beyond the five working day period." *Layton,* 953 F.2d at 846 n. 13 (citing *Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980) (statute providing for transfer to a mental hospital if certain criteria are met, coupled with the practice of the penal complex, gave rise to objective expectation that no transfer would occur unless the criteria were met)).

that he or she will remain free of the restrictions of M.C.U. and Prehearing M.C.U. unless one of the three stated criteria is met. As such, they create a protected liberty interest....

*Id.* at 849.

The regulations at issue in the present case, although paralleling the MCU regulations considered in *Layton,* also differ from them in significant respects. The regulations define "Protective custody" as:

confinement to a secure unit designated to restrict or limit an inmate's activities and contacts with others, in order to provide protection to the inmate from injury or harm actually threatened, or reasonably believed to exist based on events, investigative reports, informants' reports or other reliable sources of information.

The regulations governing admission to protective custody provide that "an inmate may be placed in Protective Custody" by one of several means in addition to "voluntarily, on the inmate's request," including "on the order of the Superintendent." N.J.A.C. 10A:5–5.1. Additionally, the regulations state that:

In all cases of involuntary placement in Protective Custody, the Superintendent, or his or her designee shall gather facts, information and available documentation to support or reject the request and shall order such additional investigation as is deemed necessary for a clear understanding of the case.

N.J.A.C. 10A:5–5.1(c). Apart from this requirement, there is no explicit limitation on the state's power to involuntarily admit an inmate to protective custody.

The regulations further provide for a hearing procedure in the case of involuntary placement. An inmate in emergency Protective custody "shall be given written notice" no later than three days after emergency placement; an inmate under consideration for such placement "shall be given written notice ... as soon as practicable." The notice "shall include:"

1. Statement of reasons utilized by the administration to initiate the Protective Custody hearing procedure; ... 3.

Notification that the inmate may present any relevant evidence supporting or contesting placement in Protective Custody. N.J.A.C. 10A:5–5.2(d). Such evidence "may consist" of "[d]ocuments bearing on the nature of threat of harm involved" and "other facts relevant to the need or lack of need for placement in Protective Custody." The notice "shall be given to the inmate at least 24 hours prior to the in-person hearing."

In the next step of the hearing process, the rules provide that:

The information contained in the notice, together with any statement or evidence provided by the inmate at the time of receipt of the notice, shall be reviewed by the Superintendent or his or her designee immediately to determine whether, pending the completion of a thorough investigation, there is a reasonable basis to conclude that the inmate is in need of Protective Custody.

N.J.A.C. 10A:5–5.2(f).

Inmates, whether in emergent protective custody or under consideration for confinement, "shall receive a hearing within 20 working days after receipt of the notice unless there are exceptional circumstances, unavoidable delays or reasonable postponements." N.J.A.C. 10A:5–5.2(i). At the hearing, "the inmate shall be informed of all information bearing on his or her case, with the exception of information designated 'confidential.' "

When reviewing confidential informant information, the Disciplinary Hearing Officer/Adjustment Committee shall inquire into the reliability of the informant and the information, and shall utilize such information only after satisfied that it is reasonably reliable. Whenever informant information is used, the inmate shall be informed of the general character of the information, if practicable. The details of informant information shall be withheld on grounds of confidentiality.

In any case in which the Disciplinary Hearing Officer or Adjustment Committee's decision is based on evidence which includes confidential information, adjudi-

cation shall contain: i. A concise summary of the facts on which the Disciplinary Hearing Officer or Adjustment Committee concluded that the informant was credible or his or her information reliable; and ii. The informant's statement (either in writing or as reported) in language that is factual rather than a conclusion, and based on the informant's knowledge of the matters contained in such statement.

N.J.A.C. 10A:5–5.2(*l*). Within 10 working days of the hearing, "the Disciplinary Hearing Officer/Adjustment Committee shall provide a written notice of decision and a summary of the evidence relied upon." N.J.A.C. 10A:5–5.2(m).

The results of such a hearing may be appealed to the Superintendent. The regulations provide that:

> All appeals shall be reviewed by the Superintendent and the following factors shall be considered: 1. Whether there was compliance with this subchapter; 2. Whether the decision was based on reliable information; and 3. Whether the decision to place the inmate in Protective Custody was justifiable considering the inmate's safety and the continued secure, orderly operation of the correctional facility.

N.J.A.C. 10A:5–5.3(c).

These regulations may be less explicit than the MCU regulations in providing guidance to the Superintendent's commitment decisions. However, after closely reviewing the protective custody regulations, the court concludes that they contain both the explicitly mandatory language and the specific substantive predicates required by *Hewitt.*

The regulations define protective custody as confinement to a secure unit "in order to provide protection to the inmate from injury or harm actually threatened or reasonably believed to exist." N.J.A.C. 10A:5–5.1 These factors—the actual or reasonably anticipated threat of harm—are as specific and provide as much substantive guidance as the factors—the "need for control," "threat of a serious disturbance," and "threat to the individual"—determining

placement in administrative custody in *Hewitt.* Further, the protective custody factors are not only as specific and substantive as the three factors identified in *Layton* as providing the basis for confinement to the MCU; the protective custody factors are also found in the same place in the New Jersey regulations as the *Layton* factors: i.e., the "Definitions" section of the "Close Custody Units" Chapter of "Department of Corrections" Title in the Administrative Code. *See* N.J.A.C. 10A:5–1.3.

The protective custody guidelines differ from the MCU regulations in the explicitness with which these substantive predicates are connected to "explicitly mandatory language." However, a review of the protective custody regulations reveals that the Superintendent is required to rely on these substantive predicates in determining an inmate's suitability for protective custody. First, as already noted, the "threatened or reasonably anticipated injury" requirement is set forth in the definition of protective custody. It follows that confinement to "protective custody" may only be ordered for the purposes specified in the definitional rule. Second, the regulations state that the Superintendent *"shall"* review the notice containing the "reasons utilized by the administration to initiate the Protective Custody hearing procedure" *"to determine whether,* pending the completion of a thorough investigation, *there is a reasonable basis to conclude that the inmate is in need of Protective Custody."* N.J.C.A. 10A:5–5.2(d) & (f) (emphasis added). This mandatory requirement necessarily directs the Superintendent to consider the purposes for which protective custody exists—i.e., protection from the actual or likely threat of injury—since only satisfaction of these criteria could provide a *reasonable* basis for commitment to protective custody. It would, for example, be wholly unreasonable to conclude that an inmate was in need of protective custody because she posed a risk of harm to others, since this is, as a matter of regulatory definition, outside the purposes protective custody was intended to serve. Further, this regulation requires that if no reasonable basis is found for continuing the in-

mate in protective custody, the Superintendent is required to release him or her to the general prison population.[5]  Hence, although the initial decision to admit an inmate to protective custody may not be limited by any criteria, the decision to allow an inmate to remain in protective custody following the Superintendent's review of the notice of commitment and the inmate's evidence is constrained by the type of "mandatory language" in connection with "specific substantive predicates" required by *Hewitt.*

Third, the regulations contain several indications that the decision of the Disciplinary Hearing Officer must be supported by evidence and reasons related to the criteria of actual or reasonably anticipated threat of injury.  The notice to an inmate "shall include" a "statement of reasons utilized by the administration to initiate the Protective Custody hearing procedure."  Similarly, the Superintendent "shall gather facts, information and available documentation to support or reject the request," and the Hearing Officer "shall provide" a "summary of the evidence relied upon" for her decision.  These requirements indicate that confinement to protective custody must be supported by reasons and evidence; this is not a case, like the visitation rules considered in *Thompson,* in which the Superintendent may exercise her authority over the inmate for any reason or no reason at all.

The protective custody regulations also state that the inmate is to be notified that he or she "may present any *relevant* evidence supporting or contesting placement in Protective Custody."  N.J.A.C. 10A:5–5.2(d) (emphasis added).  Determination of the "relevance" of evidence necessarily implies reference to the purposes for confinement in protective custody, as set forth in the definition of Protective Custody in 10A:5–1.3.[6]  This regulatory requirement that the inmate be given the opportunity to present evidence relevant to his confinement, like the requirement that the Superintendent and Hearing Officer give reasons for their decision to involuntarily confine an inmate to protective custody, would be meaningless in the absence of mandatory substantive predicates for the decision to commit to protective custody.  That reliance on these substantive predicates is mandatory is demonstrated by the fact that the Superintendent is imperatively required to rely on procedures necessarily incorporating those predicates.  *See Stephany v. Wagner,* 835 F.2d 497, 500 (3d Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988) ("existence of specified procedures ... is relevant ... to the extent that it evidences a state's intent to limit official discretion").

This conclusion is reinforced by consideration of the detailed regulatory scheme es-

---

**5.** Although the regulation does not explicitly state that release of the inmate is required if no reasonable basis is found for confining him, there is no authority for restricting an inmate to protective confinement in the face of a determination that there is no reasonable basis for doing so.  The court also cannot conclude, as a matter of legislative interpretation, that the drafters of the regulation intended that no consequence should follow from the Superintendent's determination that confinement is unreasonable, since, in that case, the requirement that the Superintendent review the reasonableness of the confinement would be pointless.  This interpretation draws further support from a similarity in structure between the rules governing Prehearing MCU detention and involuntary commitment to protective custody: just as an inmate may not be placed in prehearing MCU absent "reasonable evidence" that the applicable criteria had been met, so an inmate may not be detained in protective custody, if there is no "reasonable basis" to conclude that the inmate is

in need of it.  *See Layton,* 953 F.2d at 848; N.J.C.A. 10A:5–2.8.  That such "implicit" requirements may satisfy the *Hewitt* standard is clear from the Third Circuit's conclusion that the Prehearing MCU regulations, in providing that an inmate "shall be entitled to a hearing within five working days," "implicitly" provided that the inmate must be released from Prehearing MCU to the general prison population if no hearing is held within that time.  *See Layton,* 953 F.2d at 846 n. 13.

**6.** This view is further supported by the explanation in the regulations of what evidence is "relevant" to the placement decision:

> Evidence may consist of: 1. Witness' written statements;  2. Documents bearing on the nature of threat of harm involved;  or 3. Other facts relevant to the need or lack of need for placement in protective custody.

N.J.A.C. 10A:5–5.2(e).

tablished by the State of New Jersey. The regulations provide for enhanced procedural protections in the event of commitment to certain types of close custody units, such as the MCU and administrative segregation. *See* 10A:5–2. These detailed procedures, applicable where inmates have committed disciplinary infractions or pose a threat to property or the safety of others, would be rendered nugatory if the Superintendent possessed complete discretion to commit inmates to close custody for any reason, including punishment for disciplinary infractions or curbing a threat of violence, under the more relaxed procedures applicable to protective custody. If the decision to commit an inmate to protective custody need not be justified by reference to the criteria set forth in the definition of protective custody, there would be nothing to prevent the administrator from circumventing the procedures prescribed for commitment on other grounds.

The court thus concludes that the *Hewitt* requirements for the creation of a liberty interest are met by New Jersey's regulations governing confinement in protective custody. The *Thompson* requirement that the defined substantive predicates constitute "the only reasons for depriving the prisoner of the liberty interest in question" is also satisfied. *Layton,* 953 F.2d at 849 (citing *Thompson,* 490 U.S. 454, 109 S.Ct. 1904). In *Layton,* the Third Circuit found that the criteria for confinement listed in the regulatory definition of MCU constituted an "exhaustive list which circumscribes and limits official discretion." 953 F.2d at 848. The regulatory definition of Protective Custody precisely parallels the MCU definition, providing a similar list of predicates for a particular type of confinement. Following *Layton,* the court concludes that the criteria embodied in this regulatory definition, which states that protective custody is confinement "in order to provide protection to the inmate from injury or harm actually threatened or reasonably believed to exist," represent an "exhaustive list" of the bases on which an inmate may be protectively confined, thereby satisfying the requirements of *Thompson.* N.J.A.C. 10A:5–1.3.

The New Jersey regulations thus provide an inmate a reasonable expectation that he or she will remain free of involuntary commitment to protective custody unless a threat of harm is actually made or reasonably believed to exist. Accordingly, the court concludes that these regulations create a liberty interest in remaining a part of the general prison population, free of restrictive confinement in involuntary protective custody.

Having established the existence of a liberty interest, it next must be determined what process is due in proceedings that may deprive an inmate of that interest. At the Third Circuit stated in *Layton,* "[t]he determination of the process due an inmate who asserts a claim based on a state-created liberty interest is governed by federal constitutional law." 953 F.2d at 849 (citations omitted). Under *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the court must consider "the private interests at stake in a government decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872.

Banks' private interest is, as the Supreme Court found in a case involving administrative segregation, "not one of great consequence." *Id.* The reasoning employed by the Court in that case applies with equal force to Banks' circumstances:

> He was merely transferred from one extremely restricted environment to an even more confined situation. Unlike disciplinary confinement the stigma of wrongdoing or misconduct does not attach to administrative segregation ... Finally, there is no indication that administrative segregation will have any significant effect on parole opportunities.

*Id.* Weighing such a private interest against the governmental interest in confining an inmate who posed a threat to the safety of other prisoners and guards, and in view of the "wide-ranging deference" accorded prison administrators in "the adoption and execution of policies and prac-

tices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979), the *Hewitt* Court concluded that:

> [the prison administrators] were obligated to engage only in an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time after confining him to administrative segregation.

459 U.S. at 472, 103 S.Ct. at 872.

■ In the present case, Banks' interest in remaining in the general prison population is no weightier than the *Hewitt* inmate's interest in remaining out of administrative segregation. The governmental interest in this case may be less significant, since the predicate for placing an inmate in protective custody is that there exists a risk to his safety, not to the safety of others. However, there is no doubt that preserving the safety of all inmates and preserving order and discipline within the prison is an important government interest and lies within the core functions of the prison administration. The court is therefore satisfied that informal procedures, of the kind described by the Supreme Court in *Hewitt*, are adequate to vindicate an inmate's due process interest in remaining free of involuntary protective confinement.

Banks' objections to the procedure attending his involuntary confinement concern the prison authorities' reliance on an anonymous telephone caller, who reported that Banks was in danger if left in the general prison population. Banks contends that when his counsel substitute asked at the hearing who had spoken with the anonymous caller, Hearing Officer Larkins replied that she did not know who had received the telephone call. Plaintiff Opp. Ex. 5. Banks appears to object that this procedure violated the state's own regulations and, in the alternative, if permitted by the regulations, nonetheless violated his due process rights, because of the unreliability of the information on which his confinement was based. Banks further objects that the description of his drug trafficking in the Internal Affairs report was not reliable because it was uncorroborated by other evidence.

As stated above, the federal constitution, and not state law, determines the nature of the procedural protections due process requires. However, "[s]tate regulations may be of some assistance and guidance in determining" what process is due. *Layton*, 953 F.2d at 851. But, whether the state regulations or the federal constitution directly is relied upon as a source of procedural standards, the court concludes that the process afforded Banks was appropriate in light of the public and Governmental interests involved and "the risk of an erroneous deprivation of [private] interest through the procedures used." *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903.

■ The procedures of which Banks complains did not violate the regulations governing commitment to protective custody. Although the regulations prescribe in detail various measures that must be undertaken to insure the reliability of confidential informant information considered by the hearing officer,[7] no such requirements apply to information provided by anonymous informants. Banks contends that consideration of the anonymous informant's warning conflicted with the requirement that, on appeal, the Superintendent consider "whether the decision was based on reliable information." N.J.C.A. 10A:5–5.3. The court initially observes that Banks' appeal has apparently not yet been adjudicated. But, regardless of the outcome of that decision, the court does not find that the requirement that the Superintendent weigh reliability on appeal imports any requirement that all evidence consid-

---

7. When relying on such evidence, the adjudication record must contain:

   i. A concise summary of the facts on which the Disciplinary Hearing Officer or Adjustment Committee concluded that the informant was credible or his or her information reliable; and ii. The informant's statement ... in language that is factual rather than a conclusion, and based on the informant's knowledge of the matters contained in such statement.

   N.J.C.A. 10A:5–5.2(*l*)(1).

ered in the hearing process meet a threshold reliability standard. Nor is it apparent to the court that the anonymous informant's information was wholly unreliable, in view of the corroborating evidence that Banks was involved in drug trafficking that might expose him to a risk of violence.[8]

Similarly, the process afforded Banks does not, in the court's view, fail to satisfy the "specific dictates of due process" prescribed by *Mathews* and *Hewitt*. As in *Hewitt*, the inmate received notice of the charges against him and was afforded an opportunity to present evidence on his behalf. *See* 459 U.S. at 477, 103 S.Ct. at 874. Further, plaintiff was informed of the basis for initiation of the protective custody hearing procedure prior to the hearing and given an opportunity to respond. Banks appears to object to the inherent unreliability of anonymous informant reports. However, the court need not rule that information anonymously provided, standing alone, can provide a basis for involuntary commitment to protective custody satisfying due process. In this case, the claims of the anonymous informant were corroborated by information that Banks was involved in drug trafficking, which might reasonably be thought to expose him to a risk of violence from other inmates. The plausibility of this risk was further bolstered by information in the Internal Affairs report that Banks employed an "enforcer" in his drug trafficking operations, thereby suggesting the possibility of a heightened risk of retaliatory violence. It appears that the information produced by the state at the commitment hearing did not include signed witness statements or summaries of the facts supporting the credibility of the evidence of threats to Banks' safety. However, while such evidence would certainly be desirable and would tend to decrease the risk of erroneous commitment to protective custody, the court finds no authority for the view that such evidence is mandated in this context by the Due Process Clause. In

light of the procedural guarantees found adequate for confinement to administrative segregation in *Hewitt*, the court concludes that Banks was afforded all the process to which he was due.

Accordingly, Banks' claim will be dismissed. Because the court dismisses this action on the ground that Banks was not denied due process, it does not reach defendants' arguments that dismissal was warranted due to lack of specificity in the complaint, the qualified immunity doctrine, and the Eleventh Amendment.

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss this action is granted.

---

8. That Banks was informed of the identify of neither the caller nor the individual at the prison who received the anonymous telephone call does not, in the court's view, violate the requirement that he "be informed of all information bearing on his or her case, with the exception of information designated 'confidential.'" Banks was informed of the content of the anonymous telephone call and it was this, coupled with the information about his drug trafficking activities, that constituted the relevant information "bearing on his case."