Gary E. BLIZZARD, Johnathan T. King, Mark Bishop, and Nelson Hoover, Plaintiffs,

v.

Robert J. WATSON, Hank Risley, Stanley Taylor, and George Truitt, Defendants.

No. 93–443–RRM.

United States District Court, D. Delaware.

June 1, 1995.

Gary E. Blizzard, Johnathan T. King, Mark Bishop, and Nelson Hoover, pro se.

Susan P. Tussey, Delaware Dept. of Justice, Wilmington, DE, for defendants.

## OPINION

McKELVIE, District Judge.

This is a civil rights case. During the period in which the activities in question occurred, plaintiffs were housed in the Sussex Correctional Institution ("SCI") in Georgetown, Delaware. The defendants are various prison officials within Delaware's Department of Corrections.

In their complaint, plaintiffs allege defendants have violated their right to due process in disciplinary hearings and subjected them to cruel and unusual punishment in housing them in the Administrative Segregation and Detention Area ("ASDA"). Defendants contend plaintiffs have received all the process they are due and that the ASDA facilities do not subject inmates to cruel and unusual punishment. Defendants have filed a motion for a summary judgment. This is the court's decision on defendants' motion.

*FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiffs' complaint alleges three claims for relief. First, plaintiffs contend defendants violated their due process rights in a number of disciplinary hearings. Second, plaintiffs contend the conditions in the ASDA violate the Eighth Amendment's ban on cruel and unusual punishment. Finally, plaintiffs contend that the increase in potential time in ASDA from 15 to 90 days also violates the Eighth Amendment. Defendants deny the allegations in plaintiffs' complaint and contend plaintiffs received constitutionally adequate procedure in each case.

### A. *Procedural History of This Dispute*

Plaintiffs are no strangers to this court. This is Gary E. Blizzard's fourteenth civil rights action and Nelson Hoover's eighteenth civil rights action before this court.

On September 8, 1993, the court granted plaintiffs' petition to proceed *in forma pauperis* and plaintiffs filed a complaint pursuant to 42 U.S.C. § 1983. Docket Items ("D.I.") 1 and 2. On September 15, 1993, the court referred this case to the Magistrate. D.I. 5. This reference has been withdrawn.

On September 30, 1993, Blizzard filed a motion to amend and supplement the complaint. D.I. 13. On October 1, 1993, plaintiffs filed a motion for class certification and for a temporary restraining order. D.I. 14 and 15. On November 3, 1993, Hoover filed a motion to amend and supplement the complaint. D.I. 22. On November 22, 1993, Hoover filed yet another motion to amend the complaint. D.I. 23.

On January 3, 1994, the Magistrate denied the September 30 motion to amend and the motion for class certification but allowed plaintiffs to supplement the complaint with an alleged violation of their civil rights occurring in August of 1993. D.I. 27. On January 4, 1994, the Magistrate granted plaintiffs' November 3 motion to amend and instructed plaintiffs to file their amended complaint no later than February 1, 1994. D.I. 28. The Magistrate also indicated that any plaintiffs who failed to sign the amended complaint would be dismissed under Fed.R.Civ.P. 41. *Id.* In a second order issued on January 4, the Magistrate denied the motion for a temporary restraining order. D.I. 29. In a third order issued that same day, the Magistrate denied Hoover's November 22 motion to amend. D.I. 30.

On January 20, 1994, Hoover filed an amended complaint pursuant to the Magistrate's January 4 Order. D.I. 35. In that amended complaint, Hoover indicated that

plaintiffs King, Bishop, Scott and Cephas have been dropped from the suit. He also indicated that defendants Watson, Risley, and Taylor have been dropped from the suit. On February 9, 1994, Truitt filed an answer to the January 20 amended complaint. D.I. 39.

On February 7, 1994, Blizzard filed a motion to extend the time to file his complaint, which was granted on February 10, 1994. D.I. 38 and 41. On February 24, 1994, Blizzard filed his amended complaint, which includes claims against Risley and Watson. D.I. 43. Only Blizzard and Hoover signed their amended complaints. Consequently, the other plaintiffs will be dismissed pursuant to the Magistrate's January 4 Order. On March 17, 1994, defendants Watson, Risley, Taylor and Truitt filed an answer to Blizzard's amended complaint. On May 18, 1994, the Magistrate granted, in part, yet another motion to amend the complaint. D.I. 60. On June 10, 1994, defendants filed an answer to that amended complaint. D.I. 67.

On July 5, 1994, defendants filed a motion for a summary judgment. D.I. 76. On July 8, 1994, Blizzard filed an answer to defendants' motion. D.I. 78. On July 22, 1994, Hoover filed an answer to defendants' motion. D.I. 84. In their papers, defendants do not appear to challenge the factual allegations made by the plaintiffs in their complaint. Instead defendants contend even under the facts as alleged by plaintiffs they are entitled to a summary judgment.

### B. *Facts Relevant to Plaintiffs' Due Process Claim*

Plaintiffs first contend defendants have repeatedly denied them certain procedures guaranteed by the Due Process Clause during the course of disciplinary hearings. In support of their claim, plaintiffs describe certain disciplinary hearings and the facts surrounding those hearings in sworn affidavits. The court will set forth the events as identified by each plaintiff.

### 1. *The Metal Rod Incident—June/July 1993*

Plaintiff Hoover alleges that on June 21, 1993, two correctional officers discovered and confiscated a metal rod protruding from a radiator in the pre-trial cell in which he was housed. The cell housed a number of other inmates as well. Lt. Cave held a preliminary hearing at the pre-trial officers' station. Hoover was charged with "Possession of Dangerous Contraband" in violation of prison rules.

Later Lt. George Truitt held a disciplinary hearing regarding this incident in the pre-trial officers' building. During the course of that hearing, Truitt refused to permit Hoover to view the metal rod, call any witnesses in his defense, or cross-examine any witnesses, despite his requests. According to Hoover, Truitt's tone of voice during the hearing became "loud, provoking, disrespectful, and intentionally intimidating." Rather than perform an independent investigation into the factual basis for the allegation against Hoover, Truitt simply determined Hoover had committed the offense and sanctioned him to 10 days of isolation in ASDA.

Hoover appealed the finding of guilt by Truitt. The appeal was denied by letter dated April 22, 1994. The appeal decision indicated Hoover had presented no new material that would warrant reversal of the decision.

### 2. *Tattooing Incident—August 1993*

Hoover further alleges that on or about August 15, 1993, prison guards discovered and confiscated certain materials for use in tattooing. According to Hoover, on the day in question several other pre-trial detainees were congregating around his bed in Dorm # 2. A detainee named Thompson was apparently tattooing himself while Hoover simply sat on the bed talking with another individual. Correctional Officer Brittingham and Lt. Culkerson next "stormed into the area." As they came upon the inmates, Thompson threw a homemade tattoo needle "under Hoover's shoulder." Thompson allegedly admitted responsibility for the tattooing and explained to the correctional officers that Hoover had no involvement. However, Hoover was placed in pre-hearing detention for two weeks while Thompson was given only 24 hours detention.

On August 20, 1983, Lt. Truitt held a disciplinary hearing on this incident. Upon arriving at the hearing, Hoover informed Lt. Truitt that he had "joined a class action civil suit against" Truitt "because of the unconstitutional disciplinary hearings he conducts." Truitt's tone of voice became loud and authoritative in response. Hoover requested that he be given the opportunity to cross-examine any witnesses against him, view any evidence used to show guilt, and call witnesses on his behalf. Truitt denied each request and found that Hoover had committed the offense for which he was charged and sanctioned him to 90 days of isolation in the ASDA.

### 3. *The Book of Matches—September 1993*

Apparently, prior to September 1993, while Hoover was at "gym," an unknown correctional officer searched Hoover's cell area in the ASDA. Hoover's cell was accessible to seven other inmates at this time. The correctional officer apparently found a book of matches in Hoover's cell, and Hoover received a write-up for possession of dangerous contraband.

On September 22, 1993, Lt. Truitt held a disciplinary hearing for this offense. When Hoover arrived at the hearing, he showed Truitt a copy of the complaint filed in this action (Civil Action No. 93–443–RRM) in an effort to prove to Truitt that Hoover had joined in a lawsuit against him. Hoover then requested that Truitt recuse himself from the hearing alleging he could no longer be neutral. Truitt's tone of voice again apparently became loud and authoritative and he ordered Hoover to leave the room. Hoover was summarily given a notice of sanction imposing 10 days of isolation for this offense without the opportunity to call witnesses on his behalf, cross-examine witnesses against him, or see any evidence.

### 4. *Write–Ups Lacking Evidence—October 1993*

In October 1993, Hoover received several allegedly false write-ups from a prison employee in the medical area who accused Hoover of using abusive language. These alleged acts were apparently in violation of some form of probation that Hoover had been serving. As a result he was given 70 days isolation as a sanction. However, upon Hoover's appeal this conviction was reversed.

### 5. *Threatening Behavior—November 1993*

In November of 1993, prior to Hoover's Superior Court trial, a correctional officer apparently dumped approximately 300 sheets of Hoover's "legal paperwork" on a desk and told Hoover to pick it up while handcuffed. In response, Hoover called the officer "ignorant." Truitt again held a disciplinary hearing and Hoover again reminded him that he was a defendant in this suit. Hoover repeated his prior requests to call and cross-examine witnesses and see the evidence against him. All of these requests were denied. Truitt sanctioned Hoover to five days of isolation in the ASDA.

### 6. *Abusive Language—February 1994*

A disciplinary report dated in February 1994 accused Hoover of screaming and yelling at a nurse while she engaged in "segregation checks." According to the report Hoover's behavior was "unnecessary and disrespectful and quite threatening." In March 1994, Truitt held a disciplinary hearing on the February report. Truitt refused Hoover's request that he not sit as the hearing officer. Hoover apparently had not received a copy of the February report nor received a preliminary hearing. Truitt, however, told Hoover that he had received notice and a preliminary hearing and sanctioned him to five days of isolation.

Apparently, at the close of the hearing Hoover asked Truitt why he was continuing to deny Hoover procedural rights under the Due Process Clause. In response, Truitt yelled at Hoover and instructed the ASDA officer to not allow Hoover to use the law library for one day. The sanction of five days in isolation was overturned on appeal for failure to follow procedures.

### 7. *Blizzard Lies to Correctional Officer—June 1992*

Blizzard alleges that prior to June 1992, he received a disciplinary report accusing him of

making a false accusation. Rather than providing factual details, the report simply stated that the writer's investigation found the accusation to be false. In addition, rather than listing specific witnesses, the report generally listed medium staff and "C" tier inmates as witnesses. On June 26, 1992, Lt. Truitt conducted a disciplinary hearing during which he denied Blizzard the opportunity to call witnesses, see the evidence against him, or conduct any form of defense. After the hearing, Truitt found Blizzard guilty of the offense charged. He appealed this decision to Commissioner Hank Risley, who denied the appeal because the security staff confirmed to him that Blizzard had lied. Blizzard does not identify the sanction he received as a result of this finding.

### 8. *Bribery Incident—April 1993*

Blizzard next alleges that prior to April of 1993, he received a disciplinary report for damaging state property and bribery. A disciplinary hearing was conducted on April 7, 1993. Blizzard contends he was denied an impartial hearing officer because the officer who presided was named as a defendant in one of his civil suits in this court. In addition, Blizzard apparently was denied the opportunity to call any witnesses or see the evidence against him. The hearing officer found that Blizzard had committed the offenses for which he was charged, and Risley denied Blizzard's appeal. Again Blizzard does not identify the sanction imposed for this alleged rule violation.

### 9. *Assault—June 1993*

Sometime prior to June 22, 1993, Blizzard received a disciplinary report alleging he had assaulted another inmate. A disciplinary hearing on this report was held on June 22, 1993, during which Blizzard was denied the opportunity to call witnesses, have an impartial officer, or see the evidence against him. At the hearing, Blizzard argued that the alleged victim had said he was not assaulted, the alleged adverse witness had already stated to the administration that he had not witnessed an assault, and that the daily log book in the housing unit showed Blizzard was not present in the area at the time of the alleged assault. Despite these pleas, the hearing officer found Blizzard had committed the offense. Blizzard appealed this decision to Risley, who denied the appeal. As with the other incidents, Blizzard does not identify the sanction imposed on him.

### C. *Facts Relevant to the Conditions and Length of Confinement in the ASDA*

In addition to raising violations of due process, plaintiffs contend the conditions of confinement and the increase in the length of time in the ASDA subject them to cruel and unusual punishment in violation of the Eighth Amendment. As with the factual allegations in support of their due process claim, plaintiffs describe the conditions in the ASDA in sworn affidavits. The following facts are drawn from those affidavits.

Hoover alleges that each night he was housed in the ASDA prison guards would leave the cell door of one of the cells in the ASDA open to allow other inmates access to the toilet facilities in that cell. The toilets in the small cells are located about one foot from the stationary bed. One evening Hoover was awakened by urine splashing on his leg from a prisoner using the toilet near his bed. On another evening, Hoover awoke to "see a prisoner's bare buttocks approximately one foot from his face." This type of disturbance would occur throughout the night on those nights when Hoover's cell door was left open.

Hoover also claims he lost 26 pounds of "lean body weight" while serving 30 days of isolation in the ASDA as a disciplinary sanction. This loss of weight resulted from his being served low calorie food. Hoover also claims to have suffered headaches from a lack of ventilation while serving isolation in ASDA. Finally, Hoover claims to have been denied meaningful daily exercise while housed in the ASDA.

Blizzard alleges Commissioner Robert Watson and Warden Stanley Taylor approved of a change in the disciplinary code which now allows prison officials to sanction prisoners to ninety days in punitive isolation in the ASDA. Prior to August of 1983, the maximum sanction was fifteen days. According to Blizzard, while in isolation prisoners

are not permitted to visit with their families or friends, to receive mail, or to use the telephone.

## DISCUSSION

Having set forth plaintiffs' factual allegations, the court now turns to the merits of the dispute. Plaintiffs raise three claims in their complaint. First, they allege their due process rights have been denied in disciplinary hearings. Second, they allege the conditions in the ASDA violate the Eighth Amendment's ban on cruel and unusual punishment. Third, they allege the increase in the maximum allowable time in punitive isolation from fifteen to ninety days approved by Watson and Taylor violates the Eighth Amendment's ban on cruel and unusual punishment.

## I. *Standards for a Summary Judgment*

■ Defendants have moved for a summary judgment pursuant to Federal Rule of Civil Procedure 56. Rule 56(c) authorizes a court to grant judgment as a matter of law where it finds no genuine issues of material fact. The Supreme Court has indicated that a court may grant a summary judgment either where it finds the facts in dispute not material or where it finds the dispute over the material facts does not raise a genuine issue. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is not genuine where no reasonable jury could find for the non-moving party under the appropriate burden of persuasion. *Id.*

## II. *The Due Process Claim*

As the foundation for their due process claim, plaintiffs contend defendants have repeatedly denied them the right to call witnesses on their behalf, the right to see the evidence against them, and the right to cross-examine witnesses against them during disciplinary hearings conducted by the defendants, as well as the right to have an impartial hearing officer conduct the disciplinary hearing. Plaintiffs contend these procedural rights are guaranteed by the Due Process Clause of the Fourteenth Amendment during a disciplinary hearing in a Delaware state prison. In response, defendants contend

plaintiffs have received all the process they are due.

A number of facts appear clear from the allegations in this case. First, in each case, it appears plaintiffs were reclassified to the ASDA for a period of time as a sanction for an alleged rule violation. Second, in all but one situation, it appears plaintiffs were notified of the charges against them and permitted to make a statement to the hearing officer in their defense. In that one instance where notice was not afforded, the warden reversed the finding of guilt against Hoover.

### A. *What are the Requirements of a Due Process Claim?*

■ The Fourteenth Amendment establishes that where the state seeks to deprive persons of certain interests it must afford due process: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In order to prove a violation of the Due Process Clause, a plaintiff must show both (1) that a constitutionally protected liberty or property interest is at issue, and (2) that the state provided constitutionally insufficient procedures in its deprivation. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, when the interest deprived is not of constitutional magnitude, the Due Process Clause does not apply.

The Supreme Court's test in *Roth* restricts the role of the federal courts in reviewing deprivations by the state only to those cases in which the interests deprived are protected by the Constitution. Consequently, before this court will examine the process provided by the state, a plaintiff must demonstrate that the interest involved is constitutionally significant.

### B. *Is there a Constitutionally Significant Interest at Stake in this Case?*

In each situation identified by plaintiffs, it appears they were sanctioned to a certain number of days in segregation in the ASDA. Thus, the only interest implicated in plaintiffs' complaint is a potential liberty interest in remaining in the general prison population—or remaining free from segregation.

■ Constitutionally cognizable liberty interests can arise either from the Due Process Clause itself or from state laws or regulations which create a legitimate claim of entitlement. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). The Supreme Court has indicated the Due Process Clause, itself, provides a prisoner no liberty interest in remaining in the general prison population. *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869–70. The Court noted that as long as the "conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not by itself subject an inmate's treatment by prison authorities to judicial oversight" by the federal courts. *Id.; accord Layton v. Beyer,* 953 F.2d 839, 845 (3d Cir.1992) (noting that the Due Process Clause by "force of its own words" does not create a liberty interest in remaining in the general prison population or free from administrative segregation).

Where a liberty interest is not found in the Constitution itself, the Supreme Court has recognized that the discretion to create such an interest lies with the state. Thus, the question becomes whether Delaware has created by its laws or regulations carrying the force of law a liberty interest for prisoners housed in its prisons in remaining in the general prison population or free from segregation.

### C. Do the Statutes or Regulations Governing Delaware's Prisons Create a Liberty Interest?

■ As previously noted, in order to provide a cognizable liberty interest the language of a statute or regulation must create a legitimate claim of entitlement. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Acierno v. Cloutier,* 40 F.3d 597, 616 (3d Cir.1994). A legitimate claim of entitlement is not an "abstract desire" but instead is "an entitlement contingent on facts, something you hold unless prescribed conditions of its defeasance can be established." *Wallace v. Robinson,*

940 F.2d 243, 246 (7th Cir.1991) (en banc), *cert. denied,* 503 U.S. 961, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992). This entitlement is "[s]omething securely and durably yours as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Id.* In order to be secure enough, the entitlement must be legally enforceable. *Id.* at 246–47 (citing *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 788 n. 21, 100 S.Ct. 2467, 2477 n. 21, 65 L.Ed.2d 506 (1980)). That is, "there must be explicitly mandatory language, in connection with the establishment of specified substantive predicates to limit discretion." *Id.* at 247 (quoting *Thompson,* 490 U.S. at 463, 109 S.Ct. at 1910).

■ At least one statutory provision and a number of regulations govern the placement of Delaware prisoners in segregation. Section 6535 of Title 11 of the Delaware Code provides the authority to prison officials to establish administrative and disciplinary rules and procedures. This section reads:

The Department shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department, including procedures for dealing with violations. There shall be a record of charges of infractions by inmates, any punishments imposed and of medical inspections made.

11 *Del.C.* § 6535. As this court has held, this provision alone creates no liberty interest in a prisoner remaining in the general population. *Brown v. Cunningham,* 730 F.Supp. 612, 614 (D.Del.1990).

In addition to § 6535, Chapters 3 and 4 of the Bureau of Prisons Procedure Manual govern the placement of inmates in more restrictive custody. The regulations contained in this Manual govern prison officials and inmates at SCI. Chapter 3 involves classification decisions. Procedure Number 3.31, of this chapter, reads:

These guidelines for security/custody level classification decision making are comprehensive and uniform for placement of an inmate in the least restrictive security/custody level within an institution while also meeting the inmate's treatment/program needs. Nothing in these guidelines

is intended to, nor does it limit discretion to place an individual in any security/custody level for any proper purpose.

Classification Procedures Manual, Procedure Number 3.31, at 6. A later portion of this procedure reads:

> The warden or deputy warden may approve at their discretion the placement of an inmate at a higher or lower security/custody level. The decision may be made for various reasons, including but not limited to:
>
> (1) Inmate's attitude or conduct indicates that continued presence in general population poses a serious threat to life, property, self, staff members or other inmates or the threat of escape; or
>
> (2) Inmate is pending a hearing for a violation of institutional rules; or
>
> (3) Pending investigation or trial for a criminal act; or
>
> (4) Pending transfer or is in a holdover status during transfer.

Classification Procedures Manual, Procedure Number 3.31, at 10.

Chapter 4 sets forth the rules and procedures promulgated by the Bureau of Prisons to address violations of prison rules. It establishes two levels of rule violations, Class I and II. Class I offenses include assault, bribery, damage or destruction of property over $10, disorderly or threatening behavior, falsifying physical evidence and/or influencing a witness, felony, fighting, possession of dangerous contraband, possession of money and coin over $1, substance abuse, and theft. Class II offenses include abuse of privileges, bartering, disrespect, and failing to obey an order.

Chapter 4 also sets forth procedures for charging alleged rule violations. For example, Procedure Number 4.2 indicates that when a prison official believes a rule violation has been committed, he or she can fill out a disciplinary report listing, among other things, the facts surrounding the incident and any witnesses.

Procedure Number 4.2 goes on to indicate that for certain serious offenses, an inmate may be moved to pre-hearing detention. Where a serious offense is detailed in a disciplinary report, the Watch Commander reviews the report with the inmate and "records the inmate's statement about the charges on the form." Preferably, this review occurs at the time the inmate is moved into pre-hearing detention or shortly after. This procedure further indicates:

> For any other offense not listed, the inmate may remain in his existing status unless the inmate is considered a threat to other inmates, staff, or himself sufficient to warrant pre-hearing detention. When pre-hearing detention is ordered by the Watch Commander for offenses not listed as requiring pre-hearing detention, such order must be reviewed by the Warden within 24 hours. Failure to review pre-hearing detention may return the inmate to his previous status.... All inmates on pre-hearing detention will have their status reviewed every 24 hours.

Rules of Conduct, Procedure Number 4.2, at 5.

Following a disciplinary report and possible pre-hearing detention, Procedure Number 4.2 provides for a hearing. A Class I hearing "will be conducted by an impartial Hearing Officer, who should not have had direct supervisory responsibility over the accused inmate during the six-month period immediately preceding the hearing." However, this six-month limitation is waived for facilities with inmate populations of less than 250. In addition, Procedure Number 4.2 indicates that prison officials should provide an inmate the following:

> A. An opportunity to be present during the hearing, except that he may be excluded during the Hearing Officer's deliberations and at any time the inmate's behavior becomes disruptive to the proceedings. Reasons for such exclusions will be recorded in writing.
>
> B. The accused inmate may consult with counsel or counsel substitute prior to the hearing. At the hearing, an inmate may be accompanied by a counsel substitute who may be either a staff member or an inmate approved by the Hearing Officer. The extent to

which counsel substitutes may present an inmate's case at a disciplinary hearing is within the discretion of the Hearing Officer taking into consideration such factors as illiteracy and intelligence of the inmate, the complexity of the issues under consideration, and any other factors which may prevent the inmate from making a reasonable presentation on his own behalf.

C. Copies of any written information which the Hearing Officer may consider will be provided to the inmate except where disclosure of such information would be hazardous to institutional safety or could endanger the physical safety of an individual. Reasons for non-disclosure will be stated in writing.

D. An opportunity to make a statement and present documentary evidence on his behalf including written witness testimony.

E. An opportunity to call witnesses and/or present written statements on his behalf unless doing so would be irrelevant, redundant, or hazardous to institutional safety and security, or could endanger the physical safety of any individual. Such reasons for denial will be stated in writing. The Hearing Officer may also deny witnesses if the Hearing Officer stipulates to or will agree to the testimony that would have been given. Such stipulation or agreement will be made in writing.

F. An opportunity to confront and cross-examine his accuser and all adverse witnesses, unless doing so could be hazardous to institutional safety, order and security or could endanger the physical safety of the witness. Such reasons for denial will be stated in writing.

Rules of Conduct, Procedure Number 4.2, at 5–6. This procedure goes on to vest discretion with the Hearing Officer to exclude relevant evidence if its value is outweighed by considerations of "undue delay, waste of time, or needless presentation of cumulative evidence" provided the reasons for exclusions are stated in writing. At the conclusion of the hearing, Procedure Number 4.2 indicates that the Hearing Officer must announce his decision and the sanction to be imposed. Both the decision and the sanction must be recorded.

In addition to setting forth the rules and procedures to be followed in adjudicating violations of those rules, Chapter 4 also sets forth the permissible sanctions. Procedure Number 4.2 indicates that for Class I offenses, "[s]anctions which may be imposed" include loss of one or more privileges, confinement to assigned quarters for a period of time of not more than 15 days, isolated confinement for a period of time not more than 90 days, and loss of good time credits. For Class II offenses, the sanctions are limited to

A. Written reprimand.

B. Loss of one or more privileges for a period of time of not less than 24 hours but not more than 5 days....

C. Confinement to assigned quarters for a period of time not to exceed 5 days.

D. Summary Action.

E. By mutual agreement the inmate may be assigned extra work assignments in lieu of any other sanction for a Class II offense.

Rules of Conduct, Procedure Number 4.2, at 16. Finally, Procedure Number 4.2 indicates: "Inmates may be administratively transferred pending classification or reclassified to more restrictive security levels for violations of the Rules of Conduct."

These provisions appear to vest wide discretion in prison officials as to the placement of inmates within the prison. In Chapter 3, involving classification, Procedure Number 3.31 explicitly states that the warden has virtually unlimited discretion in placing inmates within the prison in "any security/custody level." *See, e.g., Brown*, 730 F.Supp. at 614–15 (holding, in a case involving a nondisciplinary transfer, that the regulations governing classification do not provide a prisoner with a liberty interest in remaining in the general prison population or free from segregation); *Saunders v. Watson*, 1990 U.S. Dist. LEXIS 20249, No. 88–519 (D.Del. Jan.

25, 1990 (Report and Recommendation) *adopted,* 1990 U.S. Dist. LEXIS 20248 (D.Del. June 6, 1990) (same).

In Chapter 4, involving discipline, Procedure Number 4.2 states that an inmate "may" remain at his existing custody pending a hearing. The other provisions of Procedure Number 4.2 cannot reasonably be read to suggest that an inmate must remain at his existing status until there has been a finding as to an alleged rule violation. Rather, these provisions appear to simply set forth "procedural guidelines to channel the decision making of prison officials." *Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871. The Supreme Court has clearly held that a requirement that the state afford procedures alone does not create a liberty interest. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983). Furthermore, read together Chapters 3 and 4 clearly vest wide discretion with prison officials in the placement of inmates in Delaware's prisons. Consequently, the court finds these regulations do not give an inmate a legitimate claim of entitlement to remain in the general prison population or free from segregation, and therefore, do not provide a Delaware prisoner with a constitutionally cognizable liberty interest.

Courts have interpreted the prison regulations in Pennsylvania and New Jersey as providing a prisoner in those states with a liberty interest in remaining in the general prison population. However, these decisions do not compel a similar result in this case because the regulations at issue in those decisions vary significantly from those at issue in this case.

For example, in *Layton v. Beyer,* the United States Court of Appeals for the Third Circuit reviewed administrative regulations governing New Jersey's prison system and found that they provided an inmate with a liberty interest in remaining in the general prison population or free from segregation. 953 F.2d at 846. New Jersey's regulations explicitly limited the discretion of prison officials to move an inmate into segregation. Officials could move an inmate only when they determined the inmate presented a threat to the safety of others, a threat to

property, or a threat to the operation of the facility. *Id.; see also Sheehan v. Beyer,* 51 F.3d 1170, 1174–75 (3d Cir.1995). In contrast to the regulations in New Jersey, Procedure Number 3.31 appears to provide virtually unlimited discretion to Delaware's prison officials to move an inmate to more restrictive custody.

In *Hewitt v. Helms,* the Supreme Court reviewed the regulations governing Pennsylvania's prison system and concluded that they provided an inmate with a liberty interest in remaining in the general prison population or free from segregation. 459 U.S. at 471–72, 103 S.Ct. at 871–72. *Hewitt* involved pre-hearing detention, and the applicable regulations read, in part:

> An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge.... An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance or a serious threat to the individual or others.

*Hewitt,* 459 U.S. at 470 n. 6, 103 S.Ct. at 871 n. 6. In this case, the regulation governing pre-hearing detention reads: "the inmate may remain in his existing status unless the inmate is considered a threat to other inmates, staff, or himself sufficient to warrant pre-hearing detention." Rules of Conduct, Procedure Number 4.2, at 5. This regulation provides only that a prisoner "may" remain at his existing status. Thus, the Delaware regulation creates a mere possibility that an inmate will remain at his existing custody level. In contrast, the Pennsylvania regulation allows prison officials to move an inmate to pre-hearing segregation only if they determine the inmate poses a threat to, for example, others. Thus, neither *Layton* nor *Hewitt* compel a different result in this case.

Additionally, the fact that the prison officials transferred plaintiffs for disciplinary reasons, as opposed to some other reason, does not compel a different result. Plaintiffs were transferred or reclassified from the general population to the ASDA as a sanction

for violating the rules in force at SCI. Thus, the reclassification in this case can be said to have occurred for disciplinary reasons rather than for administrative reasons.

At least one decision from this District has concluded a prisoner housed in the Delaware Correctional Center ("DCC") in Smyrna, Delaware has a limited liberty interest in remaining in the general prison population prior to a hearing on an alleged disciplinary violation. *Fridge v. Dixon,* C.A. No. 83–193–LON, at 10 (D.Del. January 30, 1985 (Report and Recommendation dated November 13, 1984). In *Fridge,* Magistrate Judge Powers examined the Code of Penal Discipline apparently in force only at DCC. Section 300.233 of that code states:

> Until the hearing, the inmate is entitled to remain in his existing status, unless he becomes a sufficient threat to other inmates, staff members, or himself to warrant pre-hearing detention.

The Magistrate read this section as having "unmistakably mandatory" language limiting the discretion of the prison officials at DCC to place an inmate in pre-hearing detention. *Fridge* at 10–11. From this, he concluded that an inmate at DCC had a limited liberty interest in remaining in his existing status pending a hearing on the alleged disciplinary violation. He also concluded that to the extent an inmate has such a limited liberty interest the process due included only "some notice of the charges against him and an opportunity to present his views to [the hearing officer]." *Fridge* at 11 (quoting *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873–74).

Unlike the situation in *Fridge,* plaintiffs in this case do not complain about pre-hearing detention. Furthermore, the regulation governing pre-hearing detention at DCC is not applicable to SCI. In fact, as previously discussed, Procedure Number 4.2 of the Rules of Conduct in force at SCI explicitly states that an inmate "may" remain at his existing custody level. Whereas, § 300.233 of the Code of Penal Discipline apparently in force only at DCC when *Fridge* was decided states: "Until the hearing, the inmate is entitled to remain in his existing status," absent certain specified conditions. Conse-

quently, *Fridge* has no application to the facts of this case.

One still might argue that the regulations in Chapter 4 should be interpreted to provide that absent a finding of a Class I rule violation, an inmate may not be reclassified to more restrictive custody. Under such an interpretation, one might also argue that a Delaware prisoner has a limited liberty interest in remaining in the general prison population absent a finding of a Class I rule violation.

■ However, it is clear that in view of the language of Chapter 3 and this court's decisions in *Brown* and *Saunders* that prison officials may reclassify or transfer a prisoner from the general prison population to the ASDA for any reason or no reason at all. The only limitation placed on this discretion is that the classification may not be based on race, religion or the exercise of a protected free speech right. *Block v. Potter,* 631 F.2d 233, 237 (3d Cir.1980). In view of this, it would be illogical for this court to find that where the reason for the transfer or classification becomes disciplinary a liberty interest is implicated. *See Wallace,* 940 F.2d at 247–49.

That is, even if plaintiffs were able to show they had not committed the alleged rule violations, they are not secure against being placed in ASDA because the prison officials could transfer them for any reason or no reason at all pursuant to the wide discretion afforded by the regulations governing classification. *Id.* No fact plaintiffs could prove or statement they could make would "establish [their] entitlement to stay" at their existing custody status or remain free from segregation. *Id.* at 247. Thus, the fact that prison officials act for disciplinary reasons as opposed to some other reason does not compel a different result.

It is clear upon review of the applicable statute and regulations that Delaware in its discretion has decided not to provide its inmates with a liberty interest in remaining in the general prison population or free from segregation. Therefore, where an inmate is subjected to segregation as the result of a disciplinary violation, this court will not sit as a disciplinary board of appeals. It may well

be that plaintiffs have a claim in state court against defendants for failure to follow the state regulations. *See Layton*, 953 F.2d at 844. However, they do not have a claim under the Due Process Clause in this court. Consequently, the court will grant defendants' motion for a summary judgment on this claim.

### III. *Do the Conditions and Time in the ASDA Violate the Eighth Amendment?*

Next, plaintiffs contend the conditions in the ASDA and the increase in time from 15 to 90 days violate the Eighth Amendment's ban on cruel and unusual punishment. The Supreme Court has stated that in order to establish a constitutional violation based on conditions of confinement, a plaintiff must prove that defendants acted with deliberate indifference to deprive them of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298, 303, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). The Court further elaborated on this standard, stating that a constitutional violation will be found only when the conditions of confinement "have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise," and that "[n]othing so amorphous as 'overall conditions' can rise to the level of [such a violation] when no specific deprivation of a single human need exists." *Id.* at 303–04, 111 S.Ct. at 2327.

■ To the extent plaintiffs argue the increase in the maximum time in ASDA allowed as a sanction for a rule violation violates the Eighth Amendment, their claim must fail. Considered by itself, being housed for 90 days in ASDA does not constitute cruel and unusual punishment. *See Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa. 1969), *aff'd*, 435 F.2d 1255 (3d Cir.1970), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

■ Moreover, plaintiffs have failed to allege facts from which a reasonable fact-finder could conclude that they have been deprived of "identifiable human needs" while housed in the ASDA. *See Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir.1994). Despite their allegations of toilets close to beds,

low-calorie food, poor ventilation, and a broad allegation of denial of meaningful exercise, plaintiffs have not shown that they have been denied food or exercise, or that the ventilation is so poor as to pose a risk of serious harm. In fact, their statement of facts suggests inmates in the ASDA are being fed, allowed exercise, and given access to bathroom facilities. Furthermore, plaintiffs have not offered any facts that would suggest defendants have acted with deliberate indifference. The conditions alleged by plaintiffs appear to constitute "amorphous conditions which do not indicate the deprivation of a particular human need." *Hoover v. Watson*, 886 F.Supp. 410, 416–17 (D.Del.1995). Consequently, the court will grant defendants' motion for a summary judgment on these claims.

### *CONCLUSION*

For the reasons set forth in this Opinion, the court will grant defendants' motion for a summary judgment on all of the claims in the plaintiffs' complaints. Furthermore, the court will enter judgment against plaintiffs King and Bishop for failure to prosecute pursuant to the Magistrate's January 4 Order. The court will enter an Order in accordance with this Opinion.